229 N.J. Super. 264 (1988)
551 A.2d 195
AQUA MARINE PRODUCTS, INC., PLAINTIFF-RESPONDENT,
v.
PATHE COMPUTER CONTROL SYSTEMS CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted November 15, 1988.
Decided December 15, 1988.
*266 Before Judges PRESSLER, SCALERA and STERN.
David S. Silverman, attorney for appellant.
JoAnn C. D'Arrigo, attorney for respondent.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
Defendant Pathe Computer Control Systems Corp., a designer and manufacturer of sophisticated computer-controlled sewing machinery, contracted with plaintiff Aqua Marine Products, Inc., to produce for it an outline quilting machine at a contract price of $75,000. The contract was subsequently modified to include, at an additional charge of $4,000, a roll-feed attachment. Plaintiff, convinced after some months following the *267 original contract that defendant lacked the capacity to produce a machine able to satisfactorily perform outline quilting, cancelled the order and demanded return of its $25,000 deposit. Defendant refused, contending that the cancellation was wrongful. Plaintiff sued, and defendant counterclaimed. Following a bench trial, the judge concluded that there were two separate contracts, one for the machine itself and one for the roll-feed attachment, and that while defendant had breached the first, plaintiff had breached the second. Accordingly, the judge set off the $4,000 price for the roll-feed attachment against the deposit plaintiff had made and entered judgment in plaintiff's favor for the difference plus prejudgment interest. Defendant appeals. We reverse.
Defendant raises both substantive and procedural issues. It contends that the trial judge erred in concluding that the parties had entered into two separate contracts and that, in any case, the verdict was against the weight of the evidence. It also contends that the trial judge erred in admitting the telephone testimony of an out-of-state witness not previously known to either party and discovered by plaintiff during trial. We agree with these claims of error and address first the substantive issues.
According to the record, plaintiff, a corporation owned by JoAnne and Loren Pettisani, is a marine supplier selling custom-made textile products, including quilted bedspreads and comforters, to boat owners. One of its speciality items is outline-quilted fabrics, that is, quilting which follows the outline of the design already imprinted on the fabric. At least as of 1984, plaintiff was unaware of any machine capable of automatic outline quilting. It was, rather, an expensive, time-consuming, hand-sewn operation. Pattern quilters, that is, machines which produce a repeated programmed pattern unrelated to the design of the fabric itself, however, were commonly available. In 1984 plaintiff heard that an outline quilting machine might have become available and canvassed quilting-machine manufacturers unsuccessfully until May 1985, when it telephoned *268 defendant's plant in Irvington and was told it produced such machines. In late May or early June, the Pettisanis visited the plant in Irvington and discussed their needs with defendant's sales manager, Janet Codos, whose brother Richard Codos is the company's chief engineer and was its sole witness. There is disagreement between the parties as to whether at that time defendant demonstrated a pattern quilter or an outline quilter, but both agree that defendant unequivocally represented its capacity to produce an outline quilter. Various conversations between the parties ensued, and finally, on August 16, 1985, plaintiff signed a contract agreeing to purchase a "Pathe Model SDI5000 Computer Controlled Single Needle Quilting Machine" together with a "king size design input digitizer" and "electronics and camera for outlining" at a total price of $75,000. The contract, among its other terms, provided for shipment within 90 to 120 days after payment of the one-third deposit and for retention by the defendant of the deposit as liquidated damages in the event of plaintiff's breach.
According to Loren Pettisani, he decided early in the fall of 1985 that "we would need some device to feed and recover the fabric on a roll." Since the machine as originally contracted for did not have such a device, defendant undertook to design one which would operate as an attachment to and adjunctive to the machine itself. Apparently, substantial negotiations and discussions ensued, culminating in this letter from defendant to plaintiff dated February 4, 1986.
As per our discussion on January 31, 1986, we are proceeding ahead with the fabrication of the Roll Fed Fabric Handling System on your 130 X 130 Quilter. I am enclosing a copy of the finished print that details the attachment. This attachment does not require Thompson Bearings, as per our original print. However, we have added universal joints to the fabric rolls, to make the fabric handling easier. Hence, there has been a trade-off in costs. As per our original quote, the price of this attachment will remain at $4,000.00.
To reiterate one point we discussed, when using the Roll Fed attachment, quilting speed reductions may be necessary, to compensate for the added weight of the fabric rolls.
We expect to be testing the Roll Fed attachment within two weeks. I will contact you then.
*269 Later in February 1986 Loren Pettisani again went to the defendant's premises to see the completed roll-feed attachment in operation. While he found it to be working generally satisfactorily, "there was a problem with the clamp system on the edges of the fabric. It would not permit the machine head to quilt close enough to the edges." After further discussion, defendant agreed to make a modification in the clamp system. Sometime in March, Pettisani returned to the factory and, according to his testimony, the roll-feed attachment was then working to his satisfaction but he was told there was now a "software problem." According to Pettisani, at this point he began to lose confidence in defendant's ability to deliver the machine as contracted for. On April 29th, he again went to the factory and saw Codos, who then told him "that the software system did not work, and they would essentially have to go back to ground zero and effect some type of a retrace system." Pettisani then concluded that defendant lacked the capacity to produce the machine, cancelled the order, and demanded return of his deposit.
While Codos did not disagree with plaintiff's basic outline of the events, he interpreted them quite differently. First, he testified that the clamp adjustment required considerable engineering and assembly effort as did the roll-feed attachment itself, which, he explained, was "not quite simply a bolt-on attachment" but had to be integrated into an overall computerized operation. Codos also testified that the so-called "software problem" referred to by Pettisani was not a defect in the design and manufacture of the machine but was rather caused by plaintiff's unreasonable insistence that the fabric be quilted to its edge. Codos' description of the difficulty was as follows:
A. Basically the clamping scheme was a hundred percent at that point. A hundred percent meaning we're still losing an inch, but assuming we have to hold something, that was the best we could do. The software scheme was, as far as I was concerned, almost an open-ended project, because it was  it was something that I wasn't even sure that we could achieve, given his parameters. At the time, you know, we were open to discuss whether, you know, the time frame. Janet was the one that suggested that we could complete the software *270 scheme in two weeks, to at least accomplish a sewn line on the edge. I don't  I don't think the sewn line along the edge was acceptable from him one inch from the edge.
Q. But that could have been done?
A. Basically that's not  basically there was no tremendously new software needed. I mean the way we input a design is we put the material on a digitizer, outline the design, and then we do the half repeat. The question  we could do the half repeat and then draw a line up the side to sew it. The question is if you want to sew off the edge, that we were  that was the question, I still don't know if we could come up with a scheme by 1990, if that's what we had to do.
Thus, Codos testified, the basic machine as ordered with the roll-feed attachment was ready for delivery at the time of the cancellation. As he explained:
Basically, the machine, as it was on April 29, was ready in that same fashion. We could sew within one inch of the clamps, we could do basic outlining. The machine was fundamentally the same as it was December, December 15 or whatever, except for the addition of a whole roll-fed attachment, and we now had it down to one inch. We still had no provision for sewing off the edge of the fabric, because no provision, as far as I know, was achievable. I mean there was no provision to duplicate a hand-done technique. There had to be some technique for clamping on the edge of the fabric.
There was no testimony by either party as to what, if any, specifications had been agreed to by the parties respecting the machine's ability to "sew to the edge" or if indeed there was ever a meeting of the minds on this aspect of the machine's capacity. The record does not indicate whether specifications were ever made part of either the original contract or the plans for the roll-feed attachment, or whether the parties ever had a mutual understanding respecting the details of the machine's operational capacity, or whether the parameters of operational capacity were, as a matter of custom and usage, subsumed by the general description of the machine as a computer-controlled outline quilter.
The trial judge in his oral opinion rendered at the end of the trial did not identify the defect in the machine which resulted in what he concluded to have been defendant's breach. Had the problem been as described by Codos, then the question would have been whether the machine's inability to sew to the edge of the fabric, although necessarily inherent in its design, *271 nevertheless rendered its performance capacity contrary to that which had been contracted for or less than plaintiff had a reasonable right to expect. Pettisani's testimony was only that a properly working outline quilter was never demonstrated to him and that, on each of his visits to the plant, defendant had another excuse for failing to run a demonstration. Perhaps then the inference could have been drawn that the conversion of the machine from a pattern quilter to an outline quilter had never been technically accomplished for reasons other than the "sewing to the edge" problem. These questions were not, however, addressed, and the point, of course, is that in the absence of specific findings on critical factual issues, it is impossible for us to perform our review function and to respond to defendant's claim that the verdict was against the weight of the evidence. See, e.g., Curtis v. Finneran, 83 N.J. 563, 569-570 (1980); Rosenberg v. Bunce, 214 N.J. Super. 300 (App. Div. 1986); Hungerford v. Greate Bay Casino Corp., 213 N.J. Super. 398 (App.Div. 1986); Monte v. Monte, 212 N.J. Super. 557 (App.Div. 1986); Anastasio v. Planning Bd. of Tp. of West Orange, 209 N.J. Super. 499 (App.Div. 1986), certif. den. 107 N.J. 46 (1986); Matter of Will of Marinus, 201 N.J. Super. 329, 338-339 (App.Div. 1985), certif. den. 101 N.J. 332 (1985).
We are, however, constrained to reject the trial judge's finding that the parties had not entered into a single amended contract but into two separate ones, one for the basic outline quilting machine and one for the roll-feed attachment. He so concluded, he explained, because, "Had the agreements been integrated, tied into each other and contingent upon each other, the parties would have entered into a written agreement outlining the terms of the purchase of the specially-designed roll feed fabric handler and specifying the contractual obligations of the plaintiff and the defendant."
We cannot agree with this reasoning. The parties dealt with each in a relatively informal manner from the commencement of their relationship; even the original contract appears to have *272 been devoid of specifications other than the descriptive references to the machine above alluded to. More significantly, however, their evolving contractual relationship concerned a single integrated machine, an outliner quilter with a roll-feed attachment. Functionally and physically, these were not two separate pieces of equipment but two components of a single complex piece of equipment. That being so, plaintiff's obligation to accept delivery and defendant's right to receive payment depended upon that single complex piece performing satisfactorily in accordance with the parties' contracted-for expectations. We fail to understand the basis for the judge's conclusion that defendant's initial breach occurred on December 16, 1985, a conclusion he based on the finding that the quilting machine was not then ready for delivery within the contractual stipulation. Obviously, it was not ready for delivery because the contract was modified to add the roll-feeder, the details of which were not yet settled by the parties. By the same token, we do not understand how plaintiff, if the basic quilting machine did not work, could have been obligated, as the court found, to accept the roll-feeder. Clearly, the roll-feeder was merely ancillary to the quilter  it had no independent function. The ultimate question of whether the machine worked could not therefore be separately decided in respect of its separate components. It worked or not as a unit.
Were we concerned only with the failure of the judge to have made specific findings, it might have been appropriate for us to remand for those findings now on the record already made. We opt, however, to remand for a new trial, not only because of what appears to be a fundamental misapplication of law by the trial judge respecting the nature of the contract but also because of his admission of testimony offered by telephone.
As we understand the events leading to the telephone testimony, plaintiff had learned through discovery that some months after plaintiff's cancellation, defendant found a buyer *273 for a basic pattern quilter. It stripped down the machine it had modified for plaintiff, reconverting the outliner quilter back into a pattern quilter, and sold that machine to its customer for the lesser price it charged for a pattern quilter with a further discount reflective of the machine's obsolescence. It refused during discovery to disclose to plaintiff the name of the buyer, allegedly to protect its customer lists in a highly competitive business. It did, however, finally identify the buyer at the outset of trial, naming a company called Southern Quilters in Henderson, North Carolina. We gather that at some time during that day or early the next, plaintiff's attorney called that firm and spoke to a person who identified himself as Mr. Dunn, a vice-president. They discussed the machine purchased from defendant the previous year and, apparently, Mr. Dunn explained that his company did not consider it to have been an unqualified success. Counsel then requested the opportunity to take Mr. Dunn's testimony by means of a speaker phone available to the judge, which also had a recording attachment. The judge agreed to proceed in accordance with plaintiff's request, reasoning that such a technique would produce reliable testimony and that defendant, who objected to this procedure, was the cause of the problem by reason of its belated discovery.
Accordingly, a telephone call was placed to Southern Quilters, plaintiff's attorney supplying the telephone number. The speaker in North Carolina identified himself as Richard Aldrich, the president, although it later appeared that someone else was the company's president when the machine was purchased. The testimonial procedure was explained to him, he agreed to testify, the judge asked him to raise his right hand and then administered an oath. On plaintiff's direct examination, he proceeded to explain various difficulties his company had had with the quilter but concluded by saying it was now running.
The testimony was obviously irrelevant  it concerned a substantially modified machine adapted to serve a different purpose  and the judge did not refer to it in his findings. The error in its admission may therefore have been harmless, but *274 we nevertheless address the issue because of our conviction that it was grossly and patently improper to admit such testimony over a party's objection.
The witness here was not known to any of the parties. Nor was he an officer of any kind, an acknowledged expert, or a witness with a definable official or other special status. He was simply a private person in business in another state with or without an axe to grind. There was no way to ascertain his identity, even to assure that he was who he said he was. Beyond that, there was no basis at all on which the indefinable and elusive indicia of credibility, denominated "demeanor," could be evaluated by the fact-finder. Nor was there an opportunity afforded to defendant to prepare a meaningful cross-examination. There was no reason, especially since this was a nonjury trial, why, had the witness' testimony been deemed significant by the plaintiff, a continuance could not have been granted in order to permit his production at trial or his videotaped or stenographic deposition to be taken de bene esse, and if defendant's discovery failure was the cause of an additional burden to plaintiff, why it could not have been ordered to bear the extra financial expenses.
Our rules of practice and procedure take into account the utility of telephone communication in appropriate circumstances. Thus, R. 1:6-2(e) expressly permits oral argument of motions by telephone on the court's direction. But, obviously, that procedure does not extend to the routine taking of testimony. It simply contemplates that attorneys, who are officers of the court and whose identities are not in question, may avoid a court appearance but still be heard in legal argument. We also note that R. 4:83-12(c), providing for appointment of a special medical guardian to make decisions respecting medical treatment in an emergency, permits the taking of oral testimony "either by telephone, in court, or at any other suitable location." And R. 4:83-6(a) permits, in an incompetency hearing conducted without a jury, that a physician's testimony may, with the consent of the parties, be taken by telephone. But *275 these, of course, are special situations in which there is either exigency or consent and in which the witness' identity and credentials are known quantities. Here there was no special circumstance compelling the taking of telephone testimony and no circumstantial voucher of the integrity of the testimony so taken and no consent.
There may well be other methods for adjudicating disputes which do not involve the adversarial process devised by the common law in which rules of evidence safeguard the reliability of the proofs offered and the ultimate determination of truth is governed by the fact-finder's credibility determinations. But that is the method to which we continue to be committed when the judicial process is invoked, and we do not lightly disregard the collective experience and wisdom from which its procedural predicates derive.
We note that most of our sister states generally agree with our perceptions. Thus, in State ex rel. Juv. Dept. v. Gates, 86 Or. App. 631, 740 P.2d 217, 218 (Ct.App. 1987), the court reversed a trial court order allowing the telephone testimony of out-of-state caseworkers and a psychologist in an action brought to terminate parental rights, the court reasoning that "[t]he opportunity to observe a witness is so critical to judicial control and effective cross-examination that its denial is manifestly prejudicial." See also Rose v. State, 294 Ark. 279, 742 S.W.2d 901 (1988), excluding the testimony of an out-of-state police officer in a Miranda hearing. When telephone testimony has been allowed, special circumstances such as those we have recognized have dictated the admission. See, e.g., Ferrante by Ferrante v. Ferrante, 127 Misc.2d 352, 485 N.Y.S.2d 960 (Sup.Ct. 1985) (videotaped telephone testimony by an essential witness 92 years old and unable to travel from Florida held admissible); State v. Aldape, 307 N.W.2d 32 (Sup.Ct.Iowa 1981) (telephone testimony of an out-of-state magistrate and peace officer held admissible in a suppression hearing where the State and defense counsel so agreed with defendant's express consent); Elson v. State, 633 P.2d 292 (Ct.App.Alaska 1981), aff'd *276 659 P.2d 1195 (Sup.Ct.Alaska 1983) (state chemist permitted to testify in sentencing hearing by telephone as to the contents of his laboratory report in a manner consistent with his trial testimony where defense counsel already had a copy of the report); Matter of W.J.C., 124 Wis.2d 238, 369 N.W.2d 162 (App. 1985) (court-appointed psychiatrist and psychologist, each of whom had already filed a full report, permitted to testify by telephone in a civil commitment hearing). See also Town of Geneva v. Tills, 129 Wis.2d 167, 384 N.W.2d 701 (1986) (holding that while telephone testimony may be permitted in circumstances in which the right to a fair trial will not be jeopardized, the telephone testimony there was improperly allowed because of its adverse effect on the right of cross-examination).
The final issue defendant raises is the court's allowance of prejudgment interest. While this question will have to be decided anew following retrial, we note only that in the absence of contractually agreed upon interest, the allowance of interest is a matter for the court to be decided consistently with equitable principles. See, e.g., Bak-A-Lum Corp. v. Alcoa Building Prod., 69 N.J. 123, 131 (1976).
Reversed and remanded for a new trial.