**ARCHEM, INC., a Wisconsin Corporation, Appellant (Defendant Below),**

v.

**Gerald SIMO a/k/a Jerry Simo, Appellee (Plaintiff Below).**

No. 03A01–8907–CV–263.

Court of Appeals of Indiana, First District.

Feb. 7, 1990.

Rehearing Denied March 27, 1990.

Thomas C. Bigley, John A. Stroh, Sharpnack, Bigley, David & Rumple, Columbus, Bruce C. O'Neill, Fox, Carpenter, O'Neill & Shannon, S.C., Milwaukee, Wis., for appellant.

Cory Brundage, James R. Fisher, Bette J. Dodd, Ice Miller Donadio & Ryan, Indianapolis, for appellee.

ROBERTSON, Judge.

Appellant-plaintiff Archem, Inc. (Archem) appeals from a jury verdict against it in favor of Gerald Simo (Simo), and from the trial court's granting judgment on the evidence in favor of Simo.

We affirm.

Archem is a wholly-owned subsidiary of Share Corporation (Share) of Milwaukee,

Wisconsin. Archem manufactures and distributes industrial chemical products. Share acquired Archem, an Arkansas corporation, in December, 1986.

In April, 1986, prior to Share's acquisition of the "old" Archem, salesman Gerald Simo signed an independent distributorship agreement with old Archem, then headed by Stan Goss. At the time he agreed to sell old Archem's products, Simo had worked for NCH, a competing business. His contract with NCH included a covenant not to compete. As a condition for Simo's joining Archem, Goss agreed to pay any legal fees incurred by Simo in defending any lawsuit NCH might bring against Simo on the restrictive covenant. NCH did bring suit, naming Simo and Archem.

The parties were sharply divided on the factual issue of whether Share undertook to pay Simo's attorney fees as part of its purchase agreement, or whether the "new" Archem agreed to pay Simo's fees only after Simo agreed to work for the new Archem five years and to sell Archem products exclusively.

New Archem alleged that Simo made oral assurances that he would sell Archem's products exclusively for at least five years, and that upon that promise, counsel for new Archem drafted a contract in which Simo was to agree that he would repay attorney fees expended by new Archem in the NCH litigation if Simo ever breached his contract with new Archem. No written contract to sell exclusively was ever signed by Simo. In April, 1987, the NCH litigation was settled, and Share had paid over $31,000 in legal fees for Simo and old Archem. The record revealed that Share had made a practice of bringing litigation against former salespeople who left the company to induce them to stay.

In August, 1987, Simo ordered for a customer a product from Athea, also a subsidiary of Share and a manufacturer of chemicals, because new Archem did not have the product in its line. When Share officers heard of this, they told Carter Elliott, then a vice-president of the new Archem, to prevail upon Simo to sign a five-year contract or face a lawsuit demanding return of the $31,000 in fees that Share had paid on Simo's behalf. Share hoped to make an example of Simo if he didn't desist from selling competitors' products. Upon learning that Simo had been selling chemical products manufactured by competitors, Share refused to fill Simo's orders. When Simo refused to sign a contract with Share, Share filed suit against Simo for misrepresentation and unjust enrichment. A third count alleging breach of contract was added later.

Simo brought a counterclaim against Archem, alleging several counts.

By the time the case reached the jury, the court had granted judgment in favor of Simo on Archem's complaint, and only three of Simo's counts remained to be decided by the jury: breach of contract, abuse of process and corrupt business influence. The jury found in favor of Simo on the breach of contract and abuse of process claims, awarding him $11,000 in compensatory damages and $750,000 in punitive damages.

The parties name six issues for our consideration:

1) whether the trial court erred in admitting evidence of Share's financial position in this suit against Archem;

2) whether the trial court erred in admitting a videotaped deposition of Carter Elliott where Archem was unable to attend the deposition and was relegated to conducting its cross-examination over a speaker telephone;

3) whether the trial court erred when it denied Archem's local counsel the opportunity to give the closing argument;

4) whether the punitive damages were excessive in proportion to compensatory damages;

5) whether judgment in favor of Simo was supported by the evidence; and

6) whether the trial court erred in granting judgment on the evidence against Archem.

I.

▪ Essentially, Archem argues that financial documents of Share were inadmissi-

ble because no Indiana case has allowed evidence of the wealth of a parent corporation in assessing punitive damages against a subsidiary. However, in other contexts, Indiana courts have held that "the fiction of corporate entity may be disregarded where one corporation is so organized and controlled and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of another corporation." *Feucht v. Real Silk Hosiery Mills, Inc.* (1938), 105 Ind.App. 405, 12 N.E.2d 1019; *General Finance Corp. v. Skinner* (1981), Ind.App., 426 N.E.2d 77; *Extra Energy Coal Co. v. Diamond Energy* (1984), Ind.App., 467 N.E.2d 439.

■ As Archem fashions its argument concerning the admissibility of financial documents (and not the sufficiency of the evidence to sustain the jury verdict awarding the high punitive damages judgment), we need only determine whether there was a sufficient evidentiary basis for the court's determination. *Clark v. Walker Kurth Lumber Co.* (1985), Tex.App., 689 S.W.2d 275; *Miller v. Goodwin* (1969), 246 Ark. 552, 439 S.W.2d 308. The economic wealth of a defendant is admissible evidence for the purpose of determining what amount of punitive damages would be appropriate to punish and deter the defendant. *Allied Mills, Inc. v. P.I.G., Inc.* (1983), Ind.App., 454 N.E.2d 1240.[1]

Before admitting evidence of Share's wealth, the court heard evidence that Paul Des Jardins was the only member of Archem's board of directors and he was chairman of the board of Share Corporation. Share filed consolidated tax returns, and Archem had not produced an annual report apart from the consolidated Share annual financial report. John Wright, who was a Share director, ran the Archem facility in Conway, Arkansas. Archem did not have its own in-house corporate counsel.

■ Identity of corporate officers is one consideration favoring piercing the corporate veil. *Stacey–Rand, Inc. v. J.J. Holman* (1988), Ind.App., 527 N.E.2d 726. The corporation's filing a consolidated tax return is another factor. *Extra Energy, supra.* There was a sufficient evidentiary basis for admitting the evidence concerning Share, and allowing such evidence to go to the jury on the question of piercing the corporate veil. *See Merriman v. Standard Grocery Company* (1968), 143 Ind. App. 654, 242 N.E.2d 128.

In addition, it should not be availing to Share that Share was not joined as a party, because our recognizing the corporations as a single entity should have the effect of making Share a party, just as piercing the corporate veil will have the effect of making service on the subsidiary corporation service to the parent, as well. *See General Finance Corp. v. Skinner* (1981), Ind.App., 426 N.E.2d 77.

We discern no reversible error in admitting evidence of Share's worth.

## II.

■ Carter Elliott was deposed by Simo's attorney at Little Rock, Arkansas. The parties agree that notice of the deposition was properly served, and Archem had actual notice of the time and place of the deposition. Nevertheless, because Archem's attorney had missed his flight, Archem did not attend the videotaped deposition of Carter Elliott, and therefore objected to its admission into evidence.

■ Admission of a deposition at trial will be affirmed by this court unless it appears that such admission constituted an abuse of discretion. *Gallagher v. State* (1984), Ind.App., 466 N.E.2d 1382; *Thomas v. State* (1981), Ind.App., 423 N.E.2d 682; *Front v. Lane* (1982), Ind.App., 443 N.E.2d 95. Subparagraph (A) of Ind.Trial Rule 32

1. Archem's authorities do not truly support its contention that the wealth of a parent corporation cannot be considered in assessing punitive damages. In *A.L. Laboratories, Inc. v. Philips Roxane* (8th Cir.1986), 803 F.2d 378, *cert. denied.*, 481 U.S. 1007, 107 S.Ct. 1632, 95 L.Ed.2d 206, the award of punitive damages against both parent and subsidiary was not upheld because the evidence did not support piercing the corporate veil. under Missouri law. In *Herman v. Hess Oil Virgin Islands Corp.* (D.C.V.I.1974), 379 F.Supp. 1268, control of the parent over the subsidiary was not an issue.

provides that "a deposition ... may be used against any party who was present or represented at the taking of the deposition by or against any party who had reasonable notice thereof ..." The appellate court in *Rambend Realty Corp. v. Backstreets Band* (1985), Ind.App., 482 N.E.2d 741 noted that our T.R.Rule 32 tracks the language of Fed.R.Civ.P. 32. The rule implies a principle of fairness requiring that the opposing party have the right or opportunity to be present at the deposition. *Bobb v. Modern Products, Inc.* (5th Cir.1981), 648 F.2d. 1051.

The parties in the instant case present markedly different views of the events which led to Archem's failure to attend the properly noticed deposition. Had the trial court merely ruled that the facts militated in favor of Simo's version of events and therefore ruled the deposition admissible, we would likely have upheld the decision as one well within the court's discretion.

However, the court apparently admitted the deposition provided that Archem be given an opportunity to cross-examine. This is evident from several entries of the record. Initially, the judge ruled: "The deposition will be admissible. What I have not decided is whether or not the gentleman who gave the deposition can be cross-examined by telephone and that's what I'm ... the question that's still up in the air as far as I'm concerned." Record 905. Later, the court promised to strike the deposition if Carter Elliott did not make himself available for telephonic cross-examination by the time all the evidence had been presented. Record, 2074, 2374-75.

Assuming that the court viewed the circumstances of the taking of Carter Elliott's deposition in a light more favorable to Archem, and then endeavored to ensure that, as a remedy, Archem had an opportunity to cross-examine, then we must determine whether, under the circumstances, the procedure by which Archem was permitted to cross-examine Elliott by speakerphone was sufficient to preserve Archem's right of cross-examination.

■ The right to cross-examine witnesses under oath is not a rule of procedure or evidence. It is fundamental to due process, and cannot, unless waived, be denied by any trier of facts, any court, or administrative tribunal. *Armes v. Pierce Governor Co.* (1951), 121 Ind.App. 566, 101 N.E.2d 199; *See Lagenour v. State* (1978), 268 Ind. 441, 376 N.E.2d 475 (right to confront witnesses includes right of full, adequate and effective cross-examination).

We have not had occasion in Indiana to consider the question whether testimony taken by speakerphone adequately accords the opposing party the right to cross-examine the absent witness. However, several foreign jurisdictions have squarely addressed the issue, and we rely upon them as persuasive authority.

The supreme court of Wisconsin held that the trial court may permit testimony by telephone in civil jury cases if, under the circumstances, the right to a fair trial is preserved. *Town of Geneva v. Tills* (1986), 129 Wis.2d 167, 384 N.W.2d 701. Hence, the judge does not have the discretion to allow admission of testimony when the right of cross-examination is limited by the circumstances. An expert witness for the town, a chemist, was suddenly unavailable for trial, but could be reached by telephone. The court held that defense counsel was hampered in cross-examining the chemist on the subject of the results of Tills' blood-alcohol exam, because the chemist was testifying from a document which was not produced in court and from which defense counsel could not have anticipated he would need to procure until the telephonic testimony was given. *Id.* at 708. The jury's inability to assess the chemist's demeanor was deemed inconsequential under these circumstances, where the examination centered on the scientific basis for the expert witness's report.

In contrast is *Aqua Marine Products, Inc. v. Pathe Computer Control Systems Corp.* (1988), 229 N.J.Super. 264, 551 A.2d 195. Defendant manufacturer had refused until right before trial to divulge the identity of the purchaser of one of its sewing machines. When plaintiffs learned who the purchaser was, they reached him by telephone, out-of-state, and he agreed to

testify by speakerphone. In *Aqua Marine,* error in the admission of the testimony was not predicated upon a particular problem in the cross-examination arising from the nature of the telephonic testimony, although the court noted that opposing counsel had little time to prepare because of the suddeness of the witness's "appearance." Rather, the appellate court assailed the procedure because it left no basis for the trier of fact's assessment of the witness's demeanor, and hence, credibility. *Id.* 551 A.2d at 200.

In the instant case, the jury was unable to determine Elliott's credibility on cross-examination from his demeanor. Elliott's credibility was crucial to Simo's abuse of process claim, because his testimony on direct was that Archem made a practice of using lawsuits to discourage its salesmen from leaving. Archem's counsel attempted to demonstrate in its cross-examination that Elliott had an axe to grind with Archem because he was the defendant in a suit Archem was pursuing because Elliott himself had started a competitive company while working for Archem. Also, Elliott was unresponsive to questions referring him to prior testimony because he did not have a transcript in front of him.

■ Because Archem could not effectively cross-examine Elliott, the trial court erred in allowing the videotaped deposition into evidence. However, the right to effectively cross-examine witnesses can be waived. *See Armes v. Pierce Governor Co., supra.* Attorneys for Archem failed to object to the procedure prior to its use. Counsel's objections to the proposed telephonic testimony were evident in the opinions in *Tills* and *Aqua Marine.* Although we find the procedure utilized may have denied Archem the right to effectively cross-examine Elliott, we find Archem's failure to object has waived the error. Hence, we will not reverse.

### III.

■ For its next issue, Archem argues that the trial court erred in not permitting Archem's attorney Bigley to give closing argument. Instead, Archem was given

several hours to allow its counsel Mr. O'Neill to prepare closing argument.

Simo had objected strenuously to Mr. Bigley's giving the argument, likening him to a witness in the case because the parties had stipulated that Simo had consulted with Mr. Bigley regarding whether he should sign the contract proferred by the new Archem. The court ruled in favor of Simo, noting that it would appear improper to the jury for Bigley to argue the credibility of witnesses when Simo had consulted with him, even if Mr. Bigley had not given any legal advice.

■ All matters which relate to the orderly conduct of trial or are necessary to proper administration of justice in court and are not regulated by precise statute or rule, are generally within the discretion of the trial court. *City of Bloomington v. Holt* (1977), 172 Ind.App. 650, 361 N.E.2d 1211. Consonant with this general rule, courts' decisions as to the order of closing arguments, *id.,* and as to whether plaintiff's second counsel could present final closing argument after defendant's counsel waived closing argument, *Conrad v. Cleveland, C., C., & St. L. Railway Co.* (1904), 34 Ind.App. 133, 72 N.E. 489, have been upheld because they were matters within the court's discretion. Archem has not demonstrated that the court's decision to deny the closing argument to Mr. Bigley was an abuse of discretion. We have examined the record of Mr. O'Neill's closing argument on Archem's behalf and it was rendered ably and thoroughly. Hence, we are also not convinced that any error in the court's ruling has affected Archem's substantial rights. *See* T.R. 61.

### IV.

■ Archem complains that the punitive damages were excessive when compared with compensatory damages. Archem also asserts that no compensatory damages were awarded for the abuse of process claim, so no punitive damages could have been awarded in the case. In the bulk of Archem's argument questioning the propriety of the damages, it views the evidence and inferences therefrom fa-

vorable to Archem. Archem's position in the case had been that it was the wronged party and it was entitled to damages from Simo. Naturally we cannot adopt Archem's view of the evidence and succeed in reviewing the jury's award of punitive damages.

 We will not reverse an award of damages as being excessive unless the damages appear so unreasonable as to convince us the jury was motivated by passion or prejudice. A high ratio of punitive damages to compensatory damages alone will not be grounds to reverse an award of punitive damages. *Emerson v. Markle* (1989), Ind.App., 539 N.E.2d 35. The purpose of punitive damages is to punish the wrongdoer and thereby deter others from engaging in similar conduct in the future. *Indiana Michigan & Electric Co. v. Stevenson* (1977), 173 Ind.App. 329, 363 N.E.2d 1254. There are two primary factors which should be properly considered in reviewing an award of punitive damages. First, the nature of the tort and the extent of the actual damages sustained should be considered. Second, the economic wealth of the defendant should be considered. *Id.*

Under this standard, we can sustain punitive damages here, which are 70 times greater than the compensatory damages. The appellate court in *Emerson v. Markle*, 539 N.E.2d 35 upheld punitive damages which were 150 times greater than actual damages when the defendant had been found to have launched a "personal crusade to intentionally and maliciously destroy a man's reputation, peace of mind and career." *Emerson*, 539 N.E.2d at 40. Likewise, Archem, according to the evidence favorable to the verdict, was determined to ruin Simo's sales prospects by refusing to supply him and by sending personnel into Simo's territory to lure his customers away, all in an attempt to coerce him into signing an exclusive, five-year contract with Archem. Also, the record shows that Share's net worth was at least $5,000,-000.

There is also no support in the record for Archem's assertion that the jury did not award any compensatory damages for abuse of process. The jury's verdict shows a judgment of $11,000 in compensatory damages for both the breach of contract and abuse of process counts. The $11,000 judgment was within the evidence presented on Simo's damages. Therefore, we will not disturb the award of punitive damages.

## V.

 Archem asserts that the verdict favorable to Simo on his breach of contract and abuse of process claims was "contrary to law," but its argument actually addresses sufficiency of the evidence to sustain the verdict. On appeal, we will not disturb the jury's decision unless the evidence is without conflict and can logically lead to but one conclusion, but the jury reached another conclusion. *Captain & Co. v. Stenberg* (1987), Ind.App., 505 N.E.2d 88.

There was evidence on Simo's breach of contract claim that Archem had refused to supply Simo with its products for which he had submitted orders. Archem failed to pay commissions owed to Simo when they were due, as provided by the contract. The evidence also exhibited a course of conduct by Archem from which the jury could have concluded that Archem had not dealt fairly and honestly with Simo, a term of the parties' contract, including testimony that Archem attempted to coerce Simo into signing an exclusive contract with Archem on pain of repaying the litigation fees Archem had incurred.

 Abuse of process requires a finding of misuse or misapplication of process, for an end other than that for which it was designed to accomplish. *Display Fixtures Co. v. R.L. Hatcher, Inc.* (1982), Ind. App., 438 N.E.2d 26. A party asserting abuse of process must show an ulterior motive and use of process that would not be proper in the normal prosecution of the case. *Central National Bank of Greencastle v. Shoup* (1986), Ind.App., 501 N.E.2d 1090. Again, the record reveals sufficient evidence supporting the elements of abuse of process. The jury heard testimony that Archem filed suit in order to intimidate Simo into signing a new contract

on more restrictive terms than his original agreement. In support of the evidence showing an ulterior motive with respect to Simo, Simo introduced evidence that Archem frequently filed suit against its salespeople in order to keep them employed with the company, and that the tactic would financially drain the defendants.

Archem contends that Simo has not demonstrated how he was damaged by Archem's filing suit, since he did not capitulate to the tactic and sign the contract. Archem does not cite any authority to support the theory that a suit filed for an improper purpose must effectuate the purposes for which it was intended.

▮ No Indiana case sets out the measure of damages for abuse of process. However, by affording a remedy in tort, our law seeks to individualize the solution to the problem of properly compensating victims of torts. No set formula is demanded, and where damages cannot be defined and calculated with mathematical certainty or by any exact standard, our courts have vested discretion in the jury. *Kavanagh v. Butorac* (1966), 140 Ind.App. 139, 221 N.E.2d 824. Anxiety and distress of mind, fairly caused by an injury, may be included as part of the damages. *Pittsburgh, Cincinnati and St. Louis Railway Co. v. Sponier* (1882), 85 Ind. 165. Simo testified that when he received a letter threatening the lawsuit, he was fearful of losing his income, and he and his wife could not pay back $31,000 in legal fees and were concerned about losing their home. The accompanying anxiety affected his relationships with his family. Record 2288–89. Simo established that he suffered damage as a proximate result of the suit.

## VI.

▮ For its final issue Archem cites the court's granting Simo's motion for judgment on the evidence on Archem's breach of contract and fraud claims. A judgment on the evidence is granted where all or some of the issues in a case tried before a jury are not supported by sufficient evidence. T.R. 50(A); *Thompson v. Best* (1985), Ind.App., 478 N.E.2d 79. We may consider only the evidence, and reasonable inferences therefrom most favorable to the non-movant. *Id.*

By Archem's admission, its allegations that Simo had not dealt "fairly and honestly" with Archem implicates the written agreement signed by Simo and Stanley Goss to which old Archem was a party. This contract called for Simo to be an independent distributor of Archem's products. It did not provide that Simo would deal exclusively in Archem's products, and it does not provide for a five-year term.

Instead of relying entirely on the written contract of April 24, 1986, Archem appears to have argued that the purported oral agreement to sell for Archem five years modified the parties' written agreement. Archem alleged that Simo had breached his promise to deal "honestly and fairly" with Archem, a term contained in the April 24th agreement. The parol evidence rule does not preclude a showing of oral agreements varying the terms of a prior integrated agreement where the oral agreement has been entered into subsequent to the writing. *Blenke Bros Co. v. Ford Motor Company* (N.D.Ind.1963), 217 F.Supp. 459, 463. However, the new contract must be supported by consideration. *Wilson v. Montgomery Ward & Co., Inc.* (N.D.Ind.1985), 610 F.Supp. 1035.

In Archem's case-in-chief, Paul Des Jardins testified that he told the sales force, including Simo, that all the existing contracts with old Archem would be honored under the new management. Simo had a written contract with old Archem to pay his legal fees, and Des Jardins admitted that old Archem's promise to pay Simo's fees had come up in the discussions leading to Archem's acquisition. Archem failed to demonstrate that its promise to pay Simo's attorney fees was separate consideration for Simo's promise to sell Archem products exclusively for five years. The rule favored in Indiana remains that any promise to do what an existing contract has already bound the promisor to do lacks consideration. *Shanks v. Fisher* (1956), 126 Ind. App. 402, 130 N.E.2d 231. Because no new contract replaced or varied the prior, writ-

ten agreement that gave Simo an independent distributorship for an unspecified period of time, there was no evidence supporting Archem's allegation that Simo had not "fairly and honestly" dealt with Archem by selling other companies' products.

■ Judgment on the evidence was also proper on Archem's fraud claim, in which it alleged Simo had represented that he intended to devote 100% of his time to selling Archem products. These representations arose out of the same events from which Archem derived its breach of contract claim. To sustain an action for fraud, the plaintiff must show a material representation of past or existing facts, which representations are false, made with knowledge or reckless ignorance of this falsity, and which cause a reliance upon these representations to the detriment of the person so relying. *Whiteco Properties, Inc. v. Thielbar* (1984), Ind.App., 467 N.E.2d 433. Archem's evidence, which added nothing to the allegations made in the complaint, fails the first element of the action. Actionable fraud cannot be predicated upon a promise to do a thing in the future, even if the promisor has no intention of fulfilling his obligation. *Id.*

The trial court did not err in granting Simo's motion for judgment on the evidence on Archem's fraud and breach of contract claims.

Judgment affirmed.

SHIELDS, P.J., and BAKER, J., concur.