Bryant MURPHY, Appellee,

v.

TIVOLI ENTERPRISES, a foreign corporation,

Exsaco Corporation, a foreign corporation, Appellant.

No. 91–2207.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 30, 1991.

Decided Jan. 6, 1992.

Patrick J. Ward, Bismarck, N.D., argued (Brent J. Edison, on brief), for appellant.

Orell D. Schmitz, Bismarck, N.D., argued (Robert S. Snyder, on brief), for appellee.

Before LAY, Chief Judge, BRIGHT, Senior Circuit Judge, and MAGILL, Circuit Judge.

BRIGHT, Senior Circuit Judge.

Bryant Murphy sustained injuries while working for his father's firm, Murphy Enterprises, when a platform on the Orbiter carnival ride, manufactured by Tivoli Enterprises (Tivoli) and sold to Murphy Enterprises by Exsaco Corporation (Exsaco), collapsed on top of him. Bryant Murphy brought this action against Tivoli and Exsaco, claiming that they either negligently manufactured or sold the Orbiter, or were strictly liable because the Orbiter was unreasonably dangerous when it left their hands. The jury absolved Tivoli of any liability and found Exsaco ten percent liable in negligence for Murphy's injuries, attributing ninety percent of the negligence which caused Murphy's injuries to "others." The jury calculated the damages at $236,130, and the district court entered judgment against Exsaco in that amount.

Exsaco appeals, alleging that the district court: (1) committed prejudicial error by allowing Murphy to present testimony of a rebuttal witness by telephone; (2) erred in failing to properly place that rebuttal witness under oath; and (3) erred in preventing counsel from communicating to the district court regarding a response that the district court gave to a question from the jury regarding instructions. Although we hold that the district court erred in admitting telephone testimony, and in preventing counsel from meaningfully objecting to the district court's proposed response to a jury's question, we conclude that those rulings did not amount to prejudicial error. We affirm.

## I. BACKGROUND

Bryant Murphy, age fifteen, worked for his father Jerry's company, Murphy Enterprises (ME), which owns and operates transportable carnival rides.[1] ME crews travel across the country during the summer months, assembling, operating and disassembling various carnival rides at local fairgrounds.

In September 1984, ME purchased the Orbiter carnival ride from Exsaco Corporation, based in Alvarado, Texas, for $258,500. ME purchased a prototype, the first transportable version of the Orbiter sold in the United States. Tivoli Enterprises, Ltd., based in Kent, England, manufactured the Orbiter and sold it to Exsaco for sale in the United States. In May 1985, ME employees, Robert "Bobby" Hall, Richard Johnson and Hall's son Mike visited Exsaco headquarters in Texas, after picking up the Orbiter ride from the docks in Houston where it had arrived from England. Exsa-

---

1. Murphy worked for his father in violation of N.D.Cent.Code § 34–07–16 (1987), which bans minors under the age of 16 from working or being employed to work.

co employees, including vice-president Jim Zaija, instructed the ME people on how to assemble and operate the Orbiter.

A steel platform approximately fifty feet in diameter forms the Orbiter's platform. Out of the center of the platform rises a tower ten feet high that holds long arms which spin passenger cars. So that a tractor trailer may transport the ride, the sides of the platform fold up vertically into an M–shape. A winch on the top of the tower pulls the sides of the platform up. A cable runs from the winch through a removable steel sheave attached to the middle of a side of the platform, and hooks to the bottom of the tower. The winch draws the cable in and pulls the side of the platform up until the platform side stands vertically. A worker detaches the cable and sheave and moves them to the opposite side of the platform, and repeats the procedure. When workers assemble the Orbiter, the winch lowers the platform sides by releasing the cable. When the Orbiter travels in its folded position, bolts attach the passenger cars to the platform. Steel pins on the bottom side of the platform secure the bolts. To assemble the ride, a worker must go under the platform to remove those pins to free the cars for use.

On July 10, 1985, ME employees arrived at the Red River Valley Fairgrounds in West Fargo, North Dakota and began assembling the Orbiter. After a crew member, using the winch and cable, partially lowered a side of the platform, Bobby Hall told Bryant Murphy to "pull the pins." Murphy had worked as a crew member on the Orbiter for several weeks, and had in the past followed Hall's instructions, and walked underneath the half-lowered platform sides of the Orbiter to pull the pins securing the passenger cars. While Murphy was under the platform on this day, the steel cable supporting it failed. Hall heard a snapping noise, like the sound of barbed wire being cut, and saw the platform start to collapse. The platform crashed on top of Bryant, giving him a severe head injury. Murphy lost hearing in one ear, his sense of taste, and suffers from seizures occasionally, unless he takes medication.

Jerry Murphy, as parent, on behalf of Bryant, brought this action for bodily injuries against Tivoli and Exsaco, alleging that they caused his injuries by either negligently manufacturing and selling the Orbiter, or were strictly liable for his injuries because they manufactured and sold an unreasonably dangerous product.

To prove negligence, Murphy alleged that Exsaco employees negligently instructed ME's employees on how to assemble the Orbiter. Bobby Hall, the foreman of the Orbiter ride on the day Bryant sustained his injuries, testified in a videotaped deposition. Hall stated that Exsaco people told him that before the platform of the Orbiter is completely lowered, a person should walk underneath the platform and remove the pins which hold the passenger cars in place. Exsaco employees explained that this is accomplished by lowering the platform halfway. While the cable held a platform side in place, an employee could climb under and "pull the pins." Exsaco vice-president Jim Zaija denied at trial ever telling ME employees that they should go underneath the platform sides of the Orbiter before they were lowered to "pull the pins." Zaija could not recall whether he was present when Exsaco employees instructed the ME people on how to raise and lower the platform sides of the Orbiter. Zaija testified that the pins should be removed by someone who crawls underneath the Orbiter platform after it has been lowered. A space about twelve inches high exists between the platform and the ground after it is lowered. Murphy argued that a worker will find it much more convenient to walk under the partially-lowered platform to pull the pins than to crawl under the lowered platform. On these facts, Murphy concluded that Exsaco failed in its duty to warn ME's employees to avoid the danger of walking under the platform.

To prove strict liability, Murphy alleged that the Orbiter contained a design flaw which caused the accident. Murphy called mechanical engineer Dr. Charles Roberts, who testified that the cable supporting the platform snapped because Tivoli improper-

ly designed the Orbiter's sheave. Roberts stated that Tivoli installed a sheave too small for the cable that wrapped around it. As a result, the sheave subjected the cable to undue "bending stress," which results when a piece of metal is bent at too great an angle. Roberts compared the stress that the sheave placed on the cable to stress people place on a coat hanger to break it, bending the metal back and forth until it snaps. Roberts testified that Tivoli should have installed a larger sheave on the platform so that the cable would not bend as much while it was in use. Roberts based his conclusions solely upon examining the cable, Plaintiff's Ex. 11, and performing calculations obtained from a standard engineering treatise.

To rebut Roberts's theory, Tivoli called its own mechanical engineer, Dr. Norman Byers. Dr. Byers disputed Roberts's theory, noting that the minimum requirement for sheave size may vary with a cable's uses. Byers noted that Roberts's calculations assume a sheave and cable system constantly in use. Byers observed that the Orbiter's winch operates only when workers assemble and disassemble the Orbiter. Therefore, Byers concluded that wear on the cable, due to a small sheave, did not cause the cable to snap. Instead, Byers concluded that overload on the cable caused it to fail. Byers defined "overload" as when a system places far more weight on a cable than it is designed to support. Byers told plaintiffs' counsel this theory at his deposition a week before trial. Byers arrived at his conclusion based on observation of the cable. Byers observed that the cable snapped in an "explosive" manner, whereby the strands of the cable shot off in different directions when the cable broke. Byers showed the jury the cable's resemblance to other cables, shown in photographs, that failed due to overload, and showed that the cable did not resemble the pictures of cables that failed due to bending stress.

Byers opined at trial that the cable failed because Murphy employees improperly hooked it to the body of the Orbiter. As a result, when Murphy's workers began lowering the platform, the cable became dis-connected from the Orbiter and ran through the pulley until the hook assembly lodged in the pulley. Byers observed that the clamp securing the hook to the cable was deformed in such a manner as if it had been pulled into the sheave. When the hook lodged in the sheave, only a single cable supported the platform, whereas if the cable had been connected to the platform, two cables would have supported the platform as it was being lowered. Byers concluded that only if the platform had been supported by a single cable could the cable have failed due to overload. Thus, Byers opined that misuse of the cable and winch system by ME employees caused the accident which injured Bryant, and not a design flaw in the Orbiter. The district court permitted Byers to testify fully on his theory that ME employees' misuse of the cable and winch caused the accident even though Byers did not arrive at his conclusion until after Murphy's attorneys had taken his deposition, a few days before trial.

Byers gave testimony that potentially devastated Murphy's strict liability claim against Tivoli and Exsaco. Murphy's counsel chose to rebut Byers by recalling Richard Keyworth, a witness who had testified via deposition earlier at trial. Counsel had read Keyworth's deposition, taken in Chicago, to the jury as evidence. Murphy Enterprises had employed Keyworth as a safety consultant for its rides, and Keyworth was at the Red River Valley Fairgrounds on the day of the accident. Keyworth arrived at the ride moments after the accident, and prepared a report describing it. In his report, Keyworth stated that he picked up off the platform the cable that failed and brought it to his office. Keyworth then gave the cable to Dr. Roberts who examined it before giving his opinion at trial. Murphy's counsel desired to call Keyworth as a witness on rebuttal because Keyworth would testify that when he arrived at the scene of the accident, the cable that failed was properly hooked to the body of the Orbiter, rebutting Byers's theory that the cable failed because it was not connected.

Unable to obtain Keyworth's presence on this short notice, Murphy's counsel asked the district court to allow Keyworth to testify by telephone. When Tivoli and Exsaco counsel resisted allowing Keyworth's telephone testimony, the district court reminded them that it had "bent over backwards" to permit Tivoli to present Dr. Byers's new opinions regarding the accident. Exsaco counsel noted that it believed telephone testimony to be "highly irregular" and objected to it. The district court overruled Exsaco's objections and concluded that it had the "inherent authority" to permit telephone testimony under the rules because Federal Rule of Civil Procedure 30(b)(7) specifically authorizes telephone depositions.

Keyworth testified by telephone that when he arrived at the scene of the accident, he observed that the winch cable was still hooked to the body of the Orbiter. Then he observed a Murphy employee unhook the cable and throw it on the ground in disgust. Keyworth picked up the cable and brought it to his office.

The jury absolved Tivoli and Exsaco of strict liability. Instead, the jury found that Exsaco, but not Tivoli, negligently caused Bryant's injuries. The jury assessed nine-ty percent of the negligence which caused Bryant's injuries to "others" and ten percent of the causation to Exsaco. The jury calculated that Bryant had incurred $236,-130 in damages. The district court entered judgment in that amount against Exsaco in favor of Bryant Murphy. The district court denied Exsaco's post-trial motions for judgment notwithstanding a verdict or a new trial in the alternative. This appeal followed.

## II.  DISCUSSION

### A.  Telephone Testimony

Exsaco argues that the district court committed prejudicial error by admitting Richard Keyworth's telephone testimony in violation of the Rules of Civil Procedure. Because no federal appellate court has ruled on this question, we will closely examine the law in this area. Our starting place is Rule 43(a) which states "[i]n all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by an Act of Congress or by these rules, the Federal Rules of Evidence, or other rules adopted by the Supreme Court."

One federal decision addresses whether Rule 43(a) permits telephone testimony.[2]

---

**2.** Two other federal cases deal with similar issues.

The court in *In re San Juan Dupont Plaza Hotel Fire Litigation*, 129 F.R.D. 424 (D.P.R. 1989), permitted counsel to examine witnesses who were beyond the subpoena power of the court by live television satellite hookup. The court determined that the alternative to satellite examination would be that actors would have to read the depositions of the witnesses to the jury. The court concluded that the jury would be able to better judge the witness's demeanor and credibility via live satellite television. *Id.* at 425. The court did not confront the issue of whether admitting satellite testimony violates Rule 43(a), but instead dealt with whether the court may subpoena witnesses to testify by satellite using Rule 45(e)(1). In holding that a party could subpoena witnesses for live satellite examination who were outside of the court's 100–mile subpoena power, the court implemented an extensive protocol of procedures for such examinations to ensure that counsel could effectively confront witnesses and that the jury could examine the witnesses' demeanor. *See id.* at 426–30.

The Tenth Circuit approved of the use of telephone testimony in criminal sentencing hearings in *United States v. Sunrhodes*, 831 F.2d 1537, 1544 (10th Cir.1987). The court overruled a hearsay objection from a defendant and permitted the government to present testimony by telephone. The court acknowledged that telephone testimony qualifies as inadmissible hearsay under Fed.R.Evid. 801. However, the court held that because the Federal Rules of Evidence do not apply in sentencing hearings, a sentencing court may admit telephone testimony so long as it finds substantial indicia of reliability. *Id.*

State courts have almost universally condemned testimony by telephone unless both parties have consented. Obviously, because of the confrontation clause, courts have not permitted telephone testimony on a substantive matter in any criminal case unless the defendant has consented. Similarly, in quasi-criminal proceedings such as involuntary commitment or parental custody hearings, courts have held that the higher burden of proof requires that the jury be able to directly assess witnesses' demeanors. *See In re Gust*, 345 N.W.2d 42, 44 (N.D.1984); *State ex rel Juvenile Dept. of Multnomah County v. Gates*, 86 Or.App. 631, 740 P.2d 217, 218 (1987). In pure civil cases, state courts have

The court in *Official Airline Guides, Inc. v. Churchfield Publications, Inc.*, 756 F.Supp. 1393 (D.Or.1990), approved, over a party's objections, the use of telephone testimony under Rule 43(a), stating that the telephone testimony was "made in open court under oath." The court noted that it "had a greater opportunity to evaluate the testimony of the witnesses through the telephone testimony than through depositions offered by both parties." *Id.* at 1398 n. 2.

■ We disagree with the *Official Airline Guides* court's reasoning that telephone testimony qualifies as testimony taken in "open court." We believe that Rule 43(a) presupposes that a witness will be physically present in the courtroom to give testimony orally. The Advisory Committee drafted Rule 43(a) to combat the practice in equity of presenting juries with edited depositions of witnesses' testimony. *See* 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2408, at 331 (1991). The federal rules strongly favor the testimony of live witnesses wherever possible, so that the jury may observe the demeanor of the witness to determine the witness's veracity. *See* 5 *Moore's Federal Practice* ¶ 43.03 (1990). For testimony to be presented "orally in open court," the witness must be present in the courtroom. *See In re Gust*, 345 N.W.2d 42, 44 (N.D.1984) (interpreting North Dakota's version of Rule 43(a) as requiring presence of witness for testimony). We know of no exception in either acts of Congress, the Rules of Civil Procedure, or the Rules of Evidence which permits telephone testimony.[3]

We recognize that the federal rules, as written, contain an anomaly. A party may depose a witness by telephone, in accord with Rule 30(b)(7). The party may then read that deposition to the jury as evidence, under Rule 32(a), so long as the party can prove that the witness cannot attend the proceeding. Thus, had the parties' attorneys deposed Keyworth by telephone, and then read Keyworth's deposition as rebuttal evidence, no violation of the rules would have occurred. However, because of the importance of a party's right to cross-examine and impeach witnesses in the presence of the jury, we interpret exceptions to Rule 43(a), such as Rule 32(a), narrowly. *See Lebeck v. William A. Jarvis, Inc.*, 250 F.2d 285, 294 (3d Cir.1957).

■ Nevertheless, the reception of the telephone testimony amounted to harmless error in this case. The questioned testimony related only to the allegation of strict liability, not to the allegation of negligence, for failure of Exsaco to properly warn and instruct ME employees on reassembly of the Orbiter. The jury decided liability solely on the negligence claim and rejected the strict liability claims against both defendants.[4] Thus, the district court's error did

been unwilling to admit telephone testimony. *See Byrd v. Nix*, 548 So.2d 1317, 1324 (Miss. 1989); *Aqua Marine Products, Inc. v. Pathe Computer Control Sys. Corp.*, 229 N.J.Super. 264, 551 A.2d 195, 200–01 (1988). State courts have permitted telephone testimony only under special circumstances, or when the parties have consented. *See, e.g., Ferrante by Ferrante v. Ferrante*, 127 Misc.2d 352, 485 N.Y.S.2d 960, 962 (1985) (videotape testimony by 92–year–old witness admissible because she was unable to travel from Florida); *State v. Aldape*, 307 N.W.2d 32 (Iowa 1981) (testimony of out-of-state magistrate admissible where state and defense counsel consent); *Elson v. State*, 633 P.2d 292, 302 (Alaska Ct.App.1981), *aff'd,* 659 P.2d 1195 (Alaska 1983) (chemist permitted to testify in sentencing hearing by telephone as to contents of lab report where defense counsel already had copy of report). Only the Wisconsin Supreme Court has approved of telephone testimony in dicta. *Town of Geneva v. Tills*, 129 Wis.2d 167, 384 N.W.2d 701, 706 (1986).

3. Under the Federal Rules of Evidence, Keyworth's telephone testimony would be hearsay because Keyworth made out-of-court statements being used for the truth of the matter asserted. Keyworth's hearsay fits under none of the hearsay exceptions.

4. Although we may not speculate as to the jury's findings, we observe that the jury apportioned 90% of the negligence which caused Bryant's injuries to "others." The only "other" actor at trial was Murphy Enterprises. In all likelihood, the jury rejected Keyworth's testimony and accepted Dr. Byers's theory that the Orbiter failed because employees from Murphy Enterprises misused the Orbiter.

The conclusion must be drawn that the jury found Murphy Enterprises constituted 90% of the cause of the accident and held Exsaco to

not substantially prejudice Exsaco. Fed. R.Civ.P. 61.

### B. Jury's Question

During the course of the jury's deliberations on February 6, 1991, the jury gave the district court a communication which stated as follows: "Need explanation of instruction # 26-last sentence—Murphy Enterprises will not be responsible to pay these damages, but any other defendant you find to be liable will, pursuant to the doctrine of joint and several liability, be required to pay that percentage of the total damages which you attribute to the negligent employer."[5] The district court prepared a response to the jury's question, and instructed one of the Deputy Clerks of Court to call the counsel for Tivoli and Exsaco on the telephone. The Clerk read the question from the jury and the district court's proposed response to the attorney for Exsaco and asked for his comments. The response by the district court was as follows:

> Instruction 26 refers to plaintiff's negligence theory of recovery.
>
> It is the court's understanding that Murphy Enterprises was a contributing employer to the North Dakota Workman's Compensation Fund and, as such, is immune from suit by its employees for injuries occurring within the scope of their employment.
>
> You are reminded again that regardless of the employer's possible immunity, you must still apportion fault to Murphy Enterprises or any other non-party who has contributed to cause Bryant's injuries.

Exsaco's attorney objected to the proposed response, and told the Clerk that the response would further confuse the jury on the issue of allocating liability. The district court read its proposed response to the jury, and the jury returned with its verdict later that day.

■ Exsaco argues that the district court failed to give it an opportunity to comment on the district court's proposed response to a question from the jury regarding the instructions. We agree. In *Fillippon v. Albion Vein Slate Co.,* 250 U.S. 76, 78, 39 S.Ct. 435, 435, 63 L.Ed. 853 (1919), the Supreme Court held that it was error for a trial judge to respond to a jury's question without giving counsel the opportunity to object to the court's response. *See also Rogers v. United States,* 422 U.S. 35, 38, 95 S.Ct. 2091, 2094, 45 L.Ed.2d 1 (1975) (reaffirming *Albion Vein Slate* in criminal cases). Given that counsel has the right to object to the district court's response to a jury question, the district court must provide counsel with a meaningful opportunity to argue its objection to the district court so that the district court may correct itself if the district court finds that it is in error. *See McKnelly v. Sperry Corp.,* 642 F.2d 1101, 1108 (8th Cir.1981); *Chicago Rock Island Pacific RR Co. v. Speth,* 404 F.2d 291, 294 (8th Cir.1968). In this case, the court did not permit counsel to meaningfully address the district court on the district court's proposed response to the jury question. *See Nations v. Sun Oil Co.,* 695 F.2d 933, 939 (5th Cir.1983) (holding that counsel should be "given an opportunity to be heard" regarding court's response). A Deputy Clerk of Court cannot be expected to persuasively convey the objections of a party to the district court. The district court should have called counsel for both parties to chambers so that they could have placed their objections to

---

10% of negligence causing the injuries based on breach of duty to warn and instruct ME's employees.

**5.** Instruction No. 26, read in its entirety, stated:

There may be evidence in this case from which you find that Bryant Murphy was an employee of Murphy Enterprises and that Murphy Enterprises, through its employees and agents, was negligent and proximately caused some or all of the injuries to Bryant Murphy.

Regardless of the fact that Murphy Enterprises is not a party to this action, you must still apportion fault to Murphy Enterprises, or any other nonparty, you believe has contributed to cause Bryant's injuries. Murphy Enterprises will not be responsible to pay these damages, but any other defendant you find to be liable will, pursuant to the doctrine of joint and several liability, be required to pay that percentage of the total damages which you attribute to the negligent employer.

the district court's proposed response on the record.

■ We observe, however, that the district court gave a substantially correct statement of the law. The district court reminded the jury to allocate liability to Murphy Enterprises, and any other non-party responsible for Murphy's injuries, in accord with North Dakota's comparative negligence statute § 9–10–07, which the district court read to the jury. Given that the jury implicitly found Murphy Enterprises responsible for 90% of the negligence that caused Murphy's injuries, we must conclude that the jury interpreted the district court's response in a manner favorable to Exsaco. In addition, before trial, Exsaco requested a jury instruction which contains the exact substance of the district court's response to the jury's question, and during trial, Exsaco's counsel asserted that Murphy Enterprises was a contributing employer. VII Tr. at 1045. Under these circumstances, the district court's response did not prejudice Exsaco's rights. The objection may have prejudiced the plaintiff, but he does not appeal the award.

Indeed, the injection of workers' compensation into the trial proceeding usually is deemed helpful to a defendant, as it may serve to hold down damages and it may have an adverse effect on the jury's consideration of liability.[6] Here, the record shows that plaintiff's counsel objected to the proposed instruction, while it is questionable that defense counsel voiced any objection to the court clerk to the text of the instruction.

We conclude here also that the error was harmless and does not justify setting aside the judgment against Exsaco.

Exsaco presented evidence to the district court of affidavits by jury members who explained that they would not have allocated any liability to Exsaco had they known that Exsaco would have to pay in full for any damages assessed. We observe that juror affidavits may not be used to show jurors' state of mind, Fed.R.Evid. 606(b). Further, the district court correctly noted

that the jury is not concerned with the actual apportionment or attribution of damages, only with the amount of damages and degree of fault.

IV. CONCLUSION

We affirm.

---

6. It was undoubtedly for this reason that plaintiff's counsel objected to mentioning workers' compensation law to the jury in instructions, and to the jury in response to its question.