Ralph EMERSON and Indiana State Teachers Association, Appellants (Defendants),

v.

Donald MARKLE, Appellee (Plaintiff).

No. 29A04–8602–CV–35.

Court of Appeals of Indiana, Fourth District.

June 1, 1989.

Richard J. Darko, Robert G. Ziegler, Tabbert, Cremer & Capehart, Indianapolis, for appellants.

Dean E. Richards, Indianapolis, for appellee.

MILLER, Judge.

Ralph Emerson and the Indiana State Teachers Association (ISTA) appeal the judgment against them after a jury trial in the amount of $1,000.00 compensatory damages, $150,000.00 punitive damages, and $31,799.00 litigation costs and attorney fees in favor of Donald Markle. Markle brought this lawsuit against Emerson, ISTA, David Selby, and the local teacher's association, the Northwestern Consolidated Classroom Teachers Association of Henry County (NCCTA). The lawsuit alleged the alternative theories of a civil action authorized under the Federal Wiretap Statute (FWS) and an action based on a common law theory of an invasion of privacy.[1] We affirm.

---

1. Defendants initially failed to file their prae-    cipe in a timely manner after the trial court

## ISSUES

Emerson and ISTA raise four issues. Attorney's fees are available under the civil remedy for the violation of the Federal Wiretap Statute; they are not available under the common law theory of an invasion of privacy. Therefore, in order to affirm the award of attorney fees, we must analyze and affirm this case under the FWS. Because we affirm under the FWS theory, we need not address the issue which pertains solely to the theory of an invasion of privacy. Therefore, we address three issues.

I. Whether sufficient evidence of probative value was presented to affirm the verdict based on a violation of the FWS?

II. Whether the verdict fails to support the judgment because of legal or logical inconsistency?

III. Whether the award of punitive damages was excessive?

## FACTS [2]

The principal characters in our drama include husband and wife, David and Sandra Selby (teachers at Shenandoah High School) Ralph Emerson (local Uniserve Director of ISTA, a statewide teachers' union), Donald Markle (principal of Shenandoah) and Robert Poffenbarger (superintendent of the school board). The role of some minor characters including representatives of the local teacher's union, the NCCTA, which was a defendant in this lawsuit, is unimportant for the purposes of this appeal and will not be discussed.

The facts most favorable to the verdict show that long before the events that gave rise to this lawsuit, Emerson, David Selby, and Markle had known each other through their participation in the negotiation of the teachers' contracts with the school corporation. Emerson and Selby were on the bargaining team that represented ISTA and the local teacher's organization. Markle was a member of the bargaining team for the school corporation.

Uncontradicted evidence indicates that, at virtually every bargaining session, Emerson made threats of physical violence to members of the school corporation's bargaining team and Markle in particular. These threats comprised of general allusions to what might happen if these school corporation representatives refused to bend to Emerson's will or what might happen to them in retaliation for their actions. For example, Emerson would suggest that legs could be broken, and automobiles and mail boxes could be damaged. Also, Emerson often made disparaging remarks about Markle's competence and qualifications as principal.

Markle had been principal of Shenandoah since the fall of 1981. He had high hopes, with the endorsement of the school board, of tightening up the atmosphere at Shenandoah that he believed had become too lax for effective learning. He perceived Shenandoah as having significant problems with truancy, smoking, drinking, and drug abuse. He attempted to implement stricter policies for both teachers and students alike in an attempt to enforce discipline and improve the learning environment at Shen-

---

entered its denial of their motion to correct errors. However, they applied for and were granted relief pursuant to Ind.Rules of Procedure, Trial Rule 60(B). The trial court vacated its original denial of their motion to correct errors and entered another one from which ISTA perfected this appeal.

Markle appealed the granting of T.R. 60(B) relief. We reversed the trial court in our published opinion, *Markle v. Indiana State Teachers Ass'n* (1986), Ind.App., 498 N.E.2d 1273.

Transfer was granted, our decision was vacated, and the trial court's grant of T.R. 60(B) relief was affirmed and reinstated. *Markle v. Indiana State Teachers Ass'n* (1987), Ind., 514 N.E.2d 612. Thus, this appeal proceeds.

2. The appellants managed to confine their argument within the 50 page limit. We gave Markle, appellee, permission to file a brief in excess of 50 pages; his brief was 93 pages long. His request appeared to be reasonable as the record consists of fourteen (14) volumes and over 3,000 pages. He alleged this case was the longest civil jury trial ever held in the Hamilton Circuit Court.

However, when we granted Markle permission to file a brief in excess of 50 pages we in no way intended to encourage him to inflict upon us his "contra statement of the facts" which comprises nearly 50 pages of an argumentative, nearly unintelligible, mostly irrelevant rendition of the facts.

andoah. However, he soon came under fire of criticism of many for changing and modifying school policies too frequently on such matters as teacher meetings, attendance, and disciplinary measures for fighting. He also received criticism for having a quick temper, problems with his office staff, and for the inconsistent implementation of discipline.

Markle had been particularly concerned with two of his teachers, the Selbys. He was under the impression they had criticized him openly and frequently in the presence of students. Sandra Selby was a young teacher and had experienced some disciplinary problems in her classroom. On one occasion, an assistant principal had been called into her classroom to restore the peace. Although Markle had given Sandra a favorable evaluation, he recommended to the school board that Sandra's teaching contract not be renewed for the following year.

Sandra intended to avail herself of all the procedural protection to which she was entitled before being dismissed. She was concerned whether she would be dismissed for incompetency or because of a reduction in force (RIF) in the teaching staff. A RIF would have no negative implication upon her abilities and give her the right of being recalled in the event of a need for teachers. She and her husband, David, met with Emerson during the Christmas holidays in December of 1982. Emerson recommended to the Selbys that if either of them were called into any meetings with Markle they should obtain a representative of the NCCTA to accompany them to document whatever Markle had to say. Emerson also recommended that if no representative was available a tape recording of any conversation should be made. David purchased a microcassette recorder for this purpose and took it to school with him.

On the morning of January 12, 1983 at approximately 7:00 A.M., David found a note in his mailbox asking him to step into Markle's office. David switched the tape recorder on. The meeting was, at least in part, for the purpose of discussing David's teaching evaluation with him—it was Markle's standard practice to privately discuss evaluations with his teachers. However, Markle also discussed Sandra's impending dismissal. He indicated the school board, not he, wanted Sandra dismissed and had taken a vote in executive session deciding to dismiss her. Markle made disparaging comments about Poffenbarger, the superintendent of the school board. He went on to discuss other embarrassing matters of a personal nature including his recent divorce and the psychiatric counseling he had received in conjunction therewith.

Selby took the tape to Emerson who listened to it, made a copy of it onto a larger standard sized cassette, and had a secretary transcribe the portions of it that he felt were important. It is undisputed that the tape could have been put to a legitimate, lawful purpose in attempting to protect Sandra's rights. If what Markle had said concerning the school board's role in Sandra's dismissal was true (it might have been false), she was dismissed illegally because a school board may not vote to dismiss a teacher in executive session.

At the school board meeting of January 19 or 26 (the record is unclear) 1983, Emerson used the two tapes, original and copy, and his partial transcription thereof to dominate the meeting and fill the room with fireworks and theatrics. Emerson initially raised a tape in each hand, pointed to Markle, and exclaimed, "we have enough information here to get this man fired." Emerson spoke for almost the entire meeting, focusing again and again on the embarrassing personal matters Markle had discussed with Selby transcribed from the tape. Markle was so embarrassed and humiliated he could not speak. He felt shame, humiliation, and ridicule and was sick to his stomach. Emerson played the tape for many other people including members of the school board at later occasions. Emerson and ISTA do not dispute the alleged action of Emerson in procuring Selby to intercept the conversation falls under the statute, 18 U.S.C. 2520, which allows a private individual to have a cause of action against any person who "intercepts, discloses or uses, *or procures the other person* to intercept,

disclose or use such communication...." (our emphasis)

Additional facts will be supplied as necessary.

## DECISION

I. *Whether sufficient evidence of probative value was presented to affirm the verdict based on a violation of the FWS?*

The parties agree that, in order to prevail under the civil remedy for the violation of the FWS, 18 U.S.C. 2510 et seq., Markle must have proven the following elements by a preponderance of the evidence:

1. That David Selby was a party to the conversation with the Plaintiff; and

2. That the conversation was taped for the purpose of committing a tortious, criminal or otherwise injurious act; and

3. That the Plaintiff had a reasonable expectation of privacy with respect to what he said.

Emerson and ISTA assert Markle failed to prove elements 2 and 3.

Emerson and ISTA would appear to admit Emerson's use of the tape was tortious or otherwise injurious. The term "otherwise injurious" includes public embarrassment. *Meredith v. Gavin*, 446 F.2d 794, (8th Cir.1971). However, they assert the statute only punishes interceptions made with an illegal, tortious, or otherwise injurious *purpose* and any motive Emerson may have had *after* he became aware of the contents of the tapes cannot be imputed to him prior to the taping. *By–Prod Corp. v. Armen–Berry Co.*, 668 F.2d 956, 67 A.L.R. Fed. 419, 1982–1 Trade Cases P 64,514 (7th Cir.1982). They argue Markle presented no evidence indicating Emerson or Selby made the tape with a prohibited purpose, but instead, all the evidence indicates the tape was made for the lawful purpose of accurately recording the conversation to protect David's and Sandra's jobs.

■ The on-going nature of the violent threats made by Emerson to Markle indicate a pattern of malice. Sufficient evidence existed that the jury could permissibly infer that, because of the malice Emer-

son harbored toward Markle, Emerson had an injurious purpose in mind when he procured Selby to tape the conversation with Markle. In fact, the evidence was such that the jury could have found that when Emerson suggested to Selby that he tape any future conversations with Markle, he hoped and desired to obtain a tape which he could use maliciously against Markle and hurt him any way he could.

■ As to the third element, concerning whether Markle had a reasonable expectation of privacy with respect to what he said to Selby, ample evidence exists. The infamous tape was played to the jury. On it, Markle was heard to make the following statement: "[w]hen I've got something to say, I want to call you in here, close the door and talk about it, and when it's dismissed, you leave and we go out there and go back to doing what we were doing." In the context of a discussion of a teacher's evaluation, in a personal office with the door closed, this statement constitutes sufficient evidence from which the jury could have found Markle had a reasonable expectation of privacy concerning his conversation with Selby.

II. *Whether the verdict fails to support the judgment because of legal or logical inconsistency?*

■ Emerson and ISTA assert the verdict is void because it is logically inconsistent for the jury to find against Emerson and his employer, ISTA, and at the same time exonerate David Selby (who actually did the taping), and the defendant David represented, the NCCTA. A verdict may be overturned if it is legally or logically inconsistent, contradictory or repugnant. But, the courts indulge every reasonable presumption in favor of the legality of the jury's verdict. *Illinois Cent. Gulf R. Co. v. Parks* (1979), 181 Ind.App. 148, 390 N.E. 2d 1073.

■ As discussed under issue I above, because of Emerson's history of malice toward Markle, sufficient evidence existed for the jury to infer Emerson procured Selby to tape the conversation with a tor-

tious, or otherwise injurious purpose. The same evidence with respect to Selby did not exist; no evidence was presented that Selby made threats toward anyone. The jury could have found that Selby made the recording for the legitimate purpose of preserving an accurate record of the conversation. Therefore, the verdict is not necessarily inconsistent. The jury could have found Emerson liable under the statute because he acted with an injurious purpose and at the same time exonerated Selby because his purpose in making the recording was legitimate.

Further, the jury received the following instruction with respect to Selby's liability:

If you find that David Selby was acting within the scope of his employment, then he is immune from liability for any errors, mistakes of judgment or unwise decisions he may have made in determining whether or not he should perform a certain act, . . . . (pertinent part only)

Obviously, the jury could have found Selby immune from liability.

The verdict was not necessarily inconsistent. We find no error.

### III. Whether the award of punitive damages was excessive?

■ We will not reverse an award of damages as being excessive unless the damages appear so unreasonable as to convince us the jury was motivated by passion or prejudice. A high ratio of punitive damages to compensatory damages alone will not be grounds to reverse an award of punitive damages. The purpose of punitive damages is to punish the wrongdoer and thereby deter others from engaging in similar conduct in the future. Two factors should be considered when reviewing an award of punitive damages—first, the nature of the tort and the extent of the actual damages sustained, and second, the economic wealth of the defendant. *Indiana & Michigan Elec. Co. v. Stevenson* (1977), 173 Ind.App. 329, 363 N.E.2d 1254.

■ Emerson and ISTA point to the fact the punitive damages awarded in the case at bar are 150 times larger than the actual damages. The punitive/actual damage ra-

tio is $150,000.00/$1,000.00 or 150. They rely on the case of *Bangert v. Hubbard* (1955), 127 Ind.App. 579, 126 N.E.2d 778 (*trans. denied*) in asserting the disproportionate amounts indicate the jury was influenced in some improper manner such as passion or prejudice. In *Bangert,* we held an award of punitive damages must bear some reasonable proportion to the amount of compensatory damages. We held a punitive/actual ratio of 104 could not stand because it indicated the jury was improperly influenced.

Without citing *Bangert,* we declined to follow its rationale in *Indiana & Michigan Elec. Co. v. Stevenson, supra.* In *Stevenson,* we stated an analysis of the punitive/actual ratio alone was incomplete. We then went on to uphold two awards with punitive/actual ratios greater than 150 ($60,000.00/$120.00 = 500 and $50,-000.00/$300.00 = 167). We noted that the small actual damages and the tort committed, a trespass to land (which resulted in property damage alone), mitigated in favor of a small punitive damage award. But, in light of the huge economic wealth of the defendant, the verdicts were not necessarily the result of passion and prejudice.

In the case at bar, we perceive, as is revealed by the evidence, the nature of the wrong perpetrated to be serious. It involved a personal crusade designed to intentionally and maliciously destroy a man's reputation, peace of mind, and career. It involved an egregious invasion of privacy—the public disclosure of intimately personal matters. Evidence was presented that ISTA had annual income of at least $4,800,-000.00. Under the two prong approach of *Stevenson,* we cannot conclude that punitive damages in the amount of $150,000.00 was necessarily the result of passion or prejudice.

■ Finally, Emerson and ISTA assert that, because of the sparsity of the evidence, the jury could not have found punitive damages were justified under the appropriate clear and convincing standard. The standard of appellate review for sufficiency on the issue of punitive damages

should impose neither greater judicial scrutiny nor lesser deference to jury determinations than in review of other sufficiency questions. In addressing the issue of sufficiency of evidence, we will affirm a judgment of punitive damages if, considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find such damages proven by clear and convincing evidence. *Bud Wolf Chevrolet, Inc. v. Robertson* (1988), Ind., 519 N.E.2d 135.

Emerson and ISTA do not complain of the following jury instruction regarding the law of punitive damages:

In addition to "compensatory" damages, the law permits you, under certain circumstances, to award what are known as "punitive" damages. Such damages are awarded in proper and specified instances in order to punish a wrongdoer for some extraordinary misconduct, and to deter the wrongdoer and others from engaging in similar conduct.

In order to sustain an award of punitive damages, there must be clear and convincing evidence of malice, fraud, or oppressive conduct indicating that the tortious conduct was inconsistent with a hypothesis of mere negligence, mistake of law or fact, honest error of judgment, over-zealousness, or other noniniquitous human failing.

Punitive damages will consist of that amount awarded by you which is not to be construed as compensation to the plaintiff for wrong done, but as a punishment to the defendant and as a deterrent to others.

The jury was also adequately instructed as to the clear and convincing standard and malice.

In the case at bar, overwhelming evidence existed of Emerson's malice toward Markle—the verbal attacks and threats of violence before the intercepting of the conversation and the relentless crusade against Markle upon which Emerson embarked once armed with the tape containing the intercepted conversation. Sufficient evidence existed that the jury could have found, by clear and convincing evidence, that punitive damages were justified.

Finding no error, we affirm.

CONOVER, P.J., and STATON, J., concur.