**MILLER BREWING COMPANY,**
**Appellant–Defendant,**

v.

**BEST BEERS OF BLOOMINGTON,**
**INC., Appellee–Plaintiff.**

No. 53A01–9008–CV–00344.

Court of Appeals of Indiana,
First District.

Oct. 9, 1991.

Transfer Denied Nov. 7, 1991.

Stephen W. Terry, Ronald D. Gifford, Baker & Daniels, Indianapolis, Gary Clendening, Harrell, Clendening & Coyne, Bloomington, for appellant-defendant.

James R. Cotner, Ronald L. Chapman, Karen A. Wyle, Cotner, Andrews, Mann & Chapman, Bloomington, for appellee-plaintiff.

SHARPNACK, Judge.

Defendant Miller Brewing Co. appeals the judgment of the Monroe Superior Court awarding plaintiff Best Beers of Bloomington, Inc. $397,000.00 in compensatory damages and $1,989,260.00 in punitive damages. We affirm the award of compensatory damages, and we affirm the judgment insofar as it finds Miller liable for punitive damages, but we reverse and remand for a new trial limited to a determination of the appropriate amount of punitive damages.

## ISSUES

Miller presents seven issues for our review on appeal. We expand and restate these issues as follows:

1. Was the award of compensatory damages supported by sufficient evidence?

2. Did the trial court correctly instruct the jury on the beer distributor termination statute, IND.CODE § 7.1–5–5–9?

3. Was evidence of the presence of overage beer in the Bloomington market after the date of the termination of Best Beer's distributorship properly admitted?

4. Was a termination letter that Miller sent to another distributor properly admitted into evidence?

5. Should the award of compensatory damages be reversed because Best Beers allegedly failed to mitigate its damages?

6. Was the award of punitive damages supported by sufficient evidence?

7. Did the trial court correctly instruct the jury as to the burden of proof in a punitive damages action?

8. Was there justification for piercing Miller's corporate veil; if not, was evidence of the wealth of Miller's parent corporation, Philip Morris, properly admitted into evidence and was the jury improperly instructed to consider the wealth of the parent when assessing punitive damages against Miller?

## FACTS

The following are the facts most favorable to the jury's verdict in favor of Best Beers. Miller Brewing Co. is a Wisconsin corporation which brews a variety of beers. It distributes its products in Indiana through independent distributors who sell the products to various retail outlets. Best Beers had been a Miller distributor since it first entered into a distributorship agreement with Miller in 1950. Under the 1950 agreement, and all the subsequent distributorship agreements between the parties, Best Beers was given the nonexclusive right to sell Miller products in certain designated counties.

Under the 1983 distributorship agreement, Miller gave Best Beers the primary responsibility for distributing various Miller products in Monroe, Brown, and Owen counties. Miller could neither give Best Beers the exclusive right to sell its products in these counties nor demand that Best Beers distribute only Miller products [1], however, because Indiana law prohibits exclusive distributorships. Because

---

**1.** In addition to Miller products, Best Beers distributed various Anheuser–Busch, Stroh, G. Heileman, and LaBatt beers. Miller did not grant Best Beers the right to distribute all of the Miller product lines; it gave another Bloomington distributor, Monroe Beverage Co., the right to distribute its most popular product, Miller Lite.

of the Miller's inability to grant exclusive distributorships, other Miller distributors could, and did, distribute Miller products in the counties assigned to Best Beers.[2]

Best Beers proved to be a satisfactory distributor of Miller products for over thirty years. From the inception of the distributorship until 1984, Best Beers never received less than a satisfactory rating from Miller. In 1984, however, the previously good relationship between Miller and Best Beers began to sour.

In January of 1984, Miller made Nancy Catalane its local area manager. At first Catalane rated Best Beers's performance as adequate, but within a few months she began to issue a series of highly unfavorable distributorship evaluations and memoranda. These unfavorable evaluations and memoranda charged Best Beers with a variety of ills including alleged mismanagement and an inability to keep overage beer out of the market, alleged acts of personal misconduct committed by one of Best Beers's senior employees, alleged attempts by Best Beers employees to convince retailers not to stock Miller High Life, and alleged failures of Best Beers sales personnel to adequately market Miller product lines.

In late 1984, one of Best Beers's prime competitors, Monroe Beverage Co., sent a letter to Miller in which Monroe Beverage intimated that Miller High Life should be added as a companion brand to Miller Lite in an "all MILLER distributorship." (Record, p. 6293). At the time, Monroe Beverage was the Miller Lite distributor in the area.

Between 1984 and 1986, Best Beers's sales of Miller High Life continually declined. In 1986, Best Beers's sales of High Life increased modestly. Best Beers's decrease in sales paralleled a nationwide decrease in the popularity of Miller High Life. Between 1980 and 1987 sales of High life in cans and bottles decreased by almost two thirds, from 21,557,569 barrels in 1980 to 7,829,760 barrels in 1987. At the same time, marketing of draught High Life rose and then declined slightly, from 1,810,912 barrels in 1980 to 1,271,859 barrels in 1987. During this time Best Beers's Miller High Life sales were equivalent to or better than the national average.

Best Beers had to contend with some difficulties in sales that were caused by Miller. In the eighties, Miller chose to emphasize Lite in its advertising while de-emphasizing High Life. In addition, Miller refused to supply Best Beers with adequate point-of-sale (p.o.s.) advertising materials while complaining that Best Beers did not maintain adequate p.o.s. materials in its retail markets. Miller also refused to fill orders from Best Beers in the manner requested by Best Beers. In many instances, Miller would not send the products Best Beers requested in the quantities requested. This caused Best Beers to be overstocked on some product lines and understocked on others.

In general, the retailers with whom Best Beers dealt were pleased with its performance. Some retailers, including one which had at one time attempted to pay Best Beers with twenty to thirty thousand dollars worth of bad checks, did, at Miller's request, lodge complaints with Miller concerning Best Beers. The three written complaints in Miller's file concerning Best Beers were all drafted in July of 1985, apparently in response to a request from a high level Miller employee.

In October of 1986, Miller sent Best Beers a preliminary notice of termination. This notice informed Best Beers that Miller intended to terminate the distributorship agreement because of a host of alleged deficiencies in Best Beers's performance:

1) failure to aggressively market the allotted Miller product lines by failing to rotate stock in retail accounts, failing to provide merchandising services and product delivery to retail accounts, and failing to comply with marketing plans and commitments made to Miller;

---

2. The practice of distributing beer outside of the assigned distributorship counties is known as transshipping.

2) failure to maintain a balanced inventory by being periodically out of stock on some product lines and not stocking others;

3) failure to maintain quality control by failing to observe code-date requirements, failing to properly rotate stock in the warehouse, vehicles, and retail locations, failing to prevent overage beer from reaching customers, failing to retrieve overage beer from retailers, failing to replace overage beer in the retail outlets, and failing to destroy overage beer when found;

4) failure to attend Miller training programs or to offer on site training programs;

5) failure to preserve Miller's good will by failing to participate in community activities, failing to convey a positive image of Miller products to retailers, and failing to "maintain a cooperative, positive attitude" toward Miller and its employees;

6) failure to provide regular deliveries to retailers;

7) failure to ensure proper placement, installation, and display of Miller p.o.s. materials in retail locations; and, finally,

8) failure to cooperate with and be friendly to Miller employees, failure to provide Miller with information upon Miller's request, and failure to implement an alcohol awareness program in Best Beers's primary territory.

Best Beers attempted to keep overage beer off of its retailers' shelves and attempted to remove beer which passed the date restriction while on the retailers' shelves. Despite its efforts, Miller representatives found overage beer in some retail accounts which were normally serviced by Best Beers. At the time the overage beer was found in the market, transshippers were also actively selling in the area.[3] Although Best Beers was not obligated to dispose of overage beer sold by transshippers under the distributorship agreement, Catalane attempted to force Best Beers to

remove and destroy beer sold by transshippers. Miller did not make any attempt on its own to remove overage beer sold by transshippers.

Best Beers took several steps to remedy the defects alleged by Miller in the termination letter. The distributor formulated a cure plan. It hired new sales personnel to concentrate on Miller products. It drafted new forms for tracking overage beer and sought the cooperation of retailers in combatting the overage beer problem. It sought to provide Miller with whatever additional information Miller requested. None of these efforts placated Miller.

Following an extended period during which Best Beers attempted to cure its alleged deficiencies, Miller terminated the distributorship agreement. Shortly thereafter, Miller awarded the distributorship to Monroe Beverage, a distributor whose performance was equivalent to, and in some ways inferior to, that of Best Beers. In awarding the distributorship to Monroe Beverage, Miller succeeded in consolidating all of its product lines in a single local distributor.

## DECISION

I. *Was The Evidence Sufficient To Support The Jury's Verdict Awarding Compensatory Damages?*

■ Miller argues that the evidence was insufficient to support the jury's verdict that Miller was liable for an unfair termination of the Best Beers distributorship. According to Miller, the uncontroverted evidence established that Best Beers failed to live up to its quality control responsibilities under the distributorship agreement, and that Best Beers's breach justified termination. Our review of the record convinces us that sufficient evidence supported the jury verdict in this regard.

When we review the evidence supporting a jury verdict in favor of a plaintiff in a civil case, we may neither reweigh the evidence nor judge the credibility of the wit-

---

**3.** As noted in a Miller communication, transshipping tended to make quality control in a market more difficult because transshippers are not as concerned about maintaining quality controls outside their primary territory.

nesses. *Martin v. Roberts* (1984), Ind., 464 N.E.2d 896, 904. We view only the evidence and attendant reasonable inferences which favor the judgment, and we will reverse only if there is a complete failure of substantial evidence or reasonable inference supporting an essential element of the plaintiff's case. *Id.*

In essence, Miller asserts that it introduced such compelling evidence both that overage beer was an intolerable transgression of the quality control provisions of the distributorship agreement and that Best Beers allowed overage beer to remain on the market that a reasonable jury could not have found that Best Beers "substantially complied with each and every obligation it had under the contract" as required by the court's final instruction number 3. In support of this assertion, Miller cites a variety of testimony to the general effect that Miller considered overage beer to be a significant problem, that Best Beers's management personnel understood the importance of keeping overage beer out of the market, and that Miller representatives found a significant amount of overage beer in the market.

■ Miller cites three cases which it claims lead to the conclusion that the termination of the distributorship was justified on these facts. We have examined these cases, and we have found that none of them compel the conclusion that the jury's verdict is unsupported by sufficient evidence. The first cited case, *Miller Brewing Co. v. Panhandle Beverage Co.* (D.Neb. July 14, 1987), No. CV85–0–700, is an unpublished opinion of the United States District Court for the District of Nebraska which we find to be singularly unpersuasive under these circumstances. In *Panhandle*, the trial court heard eight days of testimony and then, sitting as the trier of

fact, made its decision and judgment of the facts. As a trier of fact the court was entitled to reach its own conclusions concerning the question of whether the acts of the distributor in that case constituted a breach of the distributorship agreement sufficient to justify termination of the agreement under Nebraska law. That it chose to view the evidence before it in one way based upon its understanding of Nebraska law in no way lends support to the proposition that an Indiana jury should be precluded from reaching the opposite conclusion on conflicting facts in the light of Indiana law.[4]

We further find that, while both of the other cases cited by Miller in this regard, *BeerMart, Inc. v. The Stroh Brewery Co.* (7th Cir.1986), 804 F.2d 409 and *Lafayette Beverage Distributors, Inc. v. Anheuser-Busch, Inc.* (N.D.Ind.1982), 545 F.Supp. 1137, are of more value than *Panhandle*, neither provides persuasive authority for the proposition that the evidence adduced in this case logically can lead only to the conclusion that Best Beers materially breached the distributorship agreement, thus justifying Miller's termination of the agreement. In *BeerMart*, the Seventh Circuit reversed the trial court's entry of a preliminary injunction prohibiting Stroh from terminating BeerMart's distributorship. The court specifically held that Stroh was justified in terminating the distributorship agreement because the *undisputed evidence* established that BeerMart *intentionally* placed overage beer on the market in violation of the distributorship agreement. The court noted, "In contrast, the [trial] court here found that the only reason for the termination of BeerMart's contract with Stroh was BeerMart's willful, fraudulent, and deceptive acts." 804 F.2d at 412. Even if we were in total agreement

---

4. We do not believe that this unpublished opinion should have been cited to this court in any event. We note that the opinion could not be cited for any purpose, except in a case related by virtue of identity of the parties or causes of action, in either the Eighth Circuit or the District of Nebraska. 8th Cir. Rule 28A(k); 8th Cir. Plan for Publication of Opinions, § 3. Furthermore, our own appellate rules provide that unpublished opinions of this court are not to be

cited before any court for any purpose except establishing the defenses of res judicata, collateral estoppel, or law of the case. Ind. Rules of Procedure, Appellate Rule 15(A)(3). Given the policies of both our court and the federal courts governed by the Eighth Circuit rules against the use of unpublished opinions in unrelated cases, we find Miller's citation to the *Panhandle* opinion to be inappropriate.

with the Seventh Circuit's interpretation of our distributorship termination statute, we would conclude that *BeerMart* stands for no more than the proposition that undisputed evidence of an intentional violation of a distributorship agreement constitutes good cause for termination under the statute. It does not stand for the proposition that the presence of overage beer in a market is *per se* justification for termination of an agreement.

In *Lafayette Beverage*, the district court also considered a distributor's petition for an injunction prohibiting a brewer from terminating a distributorship. After hearing the evidence, the court, sitting as the trier of fact, concluded that the brewer had good cause to terminate the distributorship because the distributor had sold a substantial quantity of overage beer after the beer had been identified as overage and after the brewer's district manager ordered the distributor to destroy the beer. The court did not hold that the presence of overage beer is *per se* justification. Rather, the court merely found, based on its interpretation of the evidence, that termination was justified under the particular circumstances of the case.

At trial, Best Beers proceeded under the theory that the mere presence of overage beer in the market did not constitute a breach of the distributorship contract because the presence of overage beer in the market was unavoidable. To this end, Best Beers elicited the admissions of various Miller employees, including vice president for sales Thomas Koehler, regional sales manager Chris Zobel, and Catalane, that overage beer constituted an ongoing, and to some extent, inevitable, problem. In addition, Matt Dee, an Indiana beer distributor, testified that Zobel told him at a conference some two years after Miller terminated the Best Beers distributorship that Miller had over 100,000 cases of overage beer in this state. Best Beers was also able to present evidence that its employees had been able to purchase overage Miller products in the Bloomington market after its Miller distributorship had been terminated, and that a survey of the market taken one year after the termination found overage beer in a substantial number of retail establishments.

Best Beers presented additional evidence to support the inference that it had not breached the distributorship contract. Best Beers's employees and owner testified that transshippers caused much of the overage beer problem in Best Beers's market, and that Miller contributed to the problem by pressuring Best Beers into pushing more beer onto retailers and by not supplying Best Beers with Miller products in the quantities ordered. Steve Owens, Best Beers's manager, testified that he personally informed Miller of the presence in Best Beers's territory of overage Miller products sold by other distributors, but that Miller took no action and did not force the selling distributors to remove and destroy the product even though it was the selling distributor's duty to do so.

Best Beers presented the jury with the theory that it had lived up to its obligations under the distributorship contract because it had made reasonable efforts to keep overage beer out of its market. The jury quite apparently chose to believe Best Beers's evidence and to accept its theory of the case. It was the jury's right to choose, and we will not presume to disturb its choice on appeal. There is evidence on the record that supports the jury's verdict, and the verdict will stand.

## II. *Did The Trial Court Properly Instruct the Jury On The Distributorship Termination Statute?*

■ Miller next argues that the trial court improperly instructed the jury on the distributorship termination statute, I.C. § 7.1-5-5-9(2). The trial court's final instruction number 8 read:

At all times relevant to this law suit, there was in full force and effect an Indiana statute which read in relevant part as follows:

It is unlawful for ... a brewer ... who sells to a permittee ... for ... resale within this state to:

(2) Cancel or terminate an agreement or contract between a beer wholesaler and a brewer for the sale of beer, unfairly and

without due regard for the equities of the other party.

(Record, p. 6856). Miller objected to this instruction, and tendered its proposed final instruction in its stead. The proposed instruction read:

There was in force at all times relevant herein a statute In the State of Indiana providing in part as follows:

I.C. 7.1–5–5–9. Inequitable termination of contract prohibited. It is unlawful for a beer wholesaler or a brewer in this state, or a brewer or other person located outside this state who sells beer to a permittee in this state for the purpose of importation and resale within this state to: ...

(2) Cancel or terminate an agreement or contract between a beer wholesaler and a brewer for the sale of beer, unfairly and without due regard for the equities of the other party.

The statute does not, however, supersede the plain language of the Distributor Agreement.

Thus, if you find that Best Beers has failed to substantially comply with any obligation under the Distributor Agreement, then you may find that the contract has been fairly terminated.

(Record, p. 1503). Neither party disputes that the distributorship termination statute properly was placed before the jury for its consideration. The parties vehemently disagree, however, as to how the statute is to be interpreted. Miller contends that the trial court should have given its tendered instruction because the interpretation of the statute expressed in the instruction is a correct statement of the law as it should be applied to the facts of this case. Best Beers contends that the trial court properly refused to give the tendered instruction because it improperly stated the law.

■ A party normally is entitled to have a tendered instruction read to the jury, and we will reverse the trial court for failure to give a tendered instruction if the instruction is a correct statement of the law, if it is supported by the evidence, if it does not repeat material adequately covered by other instructions, and if the substantial rights of the tendering party would be prejudiced by the failure to give the instruction. *Board of County Commissioners v. Arick* (1985), Ind.App., 477 N.E.2d 112, 114. A party is not entitled to a repetitive instruction, or one that does not correctly state the law. We will not reverse the trial court for failing to give the best possible instructions; we will affirm as long as the trial court gave instructions which adequately and correctly stated the law. *Captain & Co. v. Stenberg* (1987), Ind.App., 505 N.E.2d 88, 97.

■ Miller cites *BeerMart* and *Lafayette Beverage* in support of its tendered instruction. Miller states that these cases stand for the proposition that our distributorship statute does not create any right to fair dealing beyond that provided under the terms of the agreement. In Miller's view, compliance with the terms of the agreement is the measure of compliance with the statute and a termination based upon a breach of any provision of the agreement, whether or not the breach is of some obligation central to the relationship and whether or not the breach is the real reason for the termination, meets the requirement of fairness and due regard for the equities of Best Beers. The text of the statute which states that it is "unlawful ... to ... terminate an agreement ... unfairly and without due regard for the equities of the other party" clearly indicates that more than mere adherence to the terms of the agreement is required. To the extent that *BeerMart* and *Lafayette Beverage* can be read to support Miller's position, they are wrongly decided.[5]

---

5. The federal court interpretations of the various provisions of our distributorship statute have proved to be most problematic. As we will explain below, *BeerMart* and *Lafayette Beverage* arguably conflict with this court's decision in *Joseph Schlitz Brewing Co. v. Central Beverage Co.* (1977), 172 Ind.App. 81, 359 N.E.2d 566, in several respects. This court recently recognized these conflicts in *Barco Beverage Corp. v. Alcoholic Beverage Commission* (1991), Ind.App., 571 N.E.2d 306, 308. Of course, because we are considering questions of Indiana law, the decisions of the courts of this state govern, and, as Judge Hoffman noted in his dissent to publish-

In *Joseph Schlitz Brewing Co. v. Central Beverage Co.* (1977), 172 Ind.App. 81, 359 N.E.2d 566, this court considered the question of whether the termination of a distributorship was unlawful under the predecessor to our present termination statute.[6] The trial court had determined that the brewer's expressed reason for terminating the agreement—the alleged failure of the distributor to comply with certain quality control procedures mandated by the brewer—was a mere subterfuge to cover an attempt to circumvent the statutes prohibiting a brewer from either granting exclusive distributorships or subverting the independence of the distributors. In affirming the judgment of the trial court, the First District wrote:

> Any termination of a brewer-wholesaler agreement *must* be made in accordance with [the termination statute]. *Clearly, the grounds for a valid termination under [the statute] must be genuine, and not a mere subterfuge.*

*Central Beverage,* 172 Ind.App. at 100, 359 N.E.2d at 578–579 (emphasis added). The court concluded that the trial court's finding that the stated reason was a mere subterfuge was supported by sufficient evidence, in part because the distributor produced evidence tending to show that the brewer felt that it had too many distributors handling its products in Indiana and wanted to narrow its operations to a few selected distributors.

It is clear, then, that a brewer may not escape scrutiny under our termination statute merely by asserting a valid business purpose for the termination or merely by asserting that the distributor committed a minor or technical breach of one of the provisions of the agreement. It would have been inappropriate to instruct the jury that the termination was fair if Best Beers failed to comply with any obligation under the agreement because, as *Central Beverage* held, termination of an agreement is unfair despite the distributor's failure to

live up to all of its obligations under an agreement if the brewer uses the violation as a mere subterfuge in order to effect the termination for an improper purpose. In addition, the instruction would have bound the jury to find the termination was fair if it found Best Beers failed to meet only one of its obligations under the agreement even if the obligation was not particularly important, and, despite its reference to substantial compliance, the instruction could have mislead the jury to believe the termination to have been fair even though it found Best Beers to have committed only a minor or technical default.

To the extent that the tendered instruction would have informed the jury that termination for violation of any provision of the agreement was fair without considering the issues of subterfuge, the importance of the provision violated, or the magnitude of the violation, it was an incorrect statement of the law. The remainder of the instruction was the text of the statute, which was covered in the trial court's instruction number eight. The trial court did not commit any error in refusing this instruction.

### III. *Was The Evidence Of Overage Beer In The Market After The Termination Of The Distributorship Properly Admitted?*

■ Again relying on *BeerMart* and *Panhandle,* Miller argues that the trial court improperly admitted into evidence the results of a post termination survey of 65 of the retailers in the territory of the non-exclusive area of primary responsibility which had been serviced by Best Beers before the termination of the distributorship agreement. This survey, taken between July 8, 1988, and March 18, 1989, revealed overage beer in 46 of the 65 retailer establishments. Miller argues that the survey results were irrelevant to any issue in the case.

---

ing an opinion addressing the rehearing petition in *Barco,* "[The opinions in *BeerMart* and *Lafayette Beverage*] have no more precedential value than opinions from any other state or the trial bench of Ohio." 571 N.E.2d at 309.

**6.** I.C. § 7–2–1–23(a)(2), which was repealed and replaced by I.C. § 7.1–5–5–9 in 1976.

■ The trial court is invested with the discretion to determine the relevance of the evidence offered at trial, and we may reverse the trial court only if it has abused its discretion. *State v. Hall* (1982), Ind., 432 N.E.2d 679, 682. We may find that the trial court abused its discretion in the admission of evidence on grounds of relevance only where the trial court admits evidence which has no tendency, no matter how slight, to prove a material fact or support a material inference. *In re Paternity of Tompkins* (1989), Ind.App., 542 N.E.2d 1009, 1013.

Here, the trial court did not abuse its discretion in admitting the results of the survey. At trial, Best Beers attempted to show that it substantially complied with the agreement, but that, despite its best efforts, the presence of overage beer was inevitable in any market. In addition, Best Beers sought to prove that Miller's asserted reason for terminating the agreement was a mere subterfuge to allow Miller to establish an all Miller distributorship with Monroe Beverage. The evidence, by demonstrating that there was overage beer in the market after Monroe Beverage displaced Best Beers, tended to support both of these theories. The survey was relevant, and the trial court did not err in allowing it into evidence.

### IV. *Was The Termination Letter Sent To Another Distributor Improperly Admitted Into Evidence?*

■ Miller next complains of the trial court's admission into evidence of a termination letter which Miller sent to Crowley Beverage Co. of Austin, Minn. in 1984. Miller alleges that the Crowley letter was irrelevant to any issue at trial.

■ The Crowley letter was sent by Miller as a notice to Crowley of the termination of the distributorship agreement between them roughly two years prior to the termination letter sent by Miller to Best Beers. The two letters were nearly identical. There were, however, reasons for termination stated in the Crowley letter that were not stated in the Best Beers letter and reasons stated in the Best Beers letter that were not stated in the Crowley letter.

The propositions that arguably tend to be proved by the Crowley letter are that the Best Beers letter was a sham in that it did not state the real (and improper) reason for the termination and that the Best Beers letter did not meaningfully inform Best Beers of the steps it needed to take to avoid termination. Assuming that the Crowley letter was identical to the Best Beers letter, we see no logical connection between that identity and either of the propositions and, therefore, no relevance of the Crowley letter to this case. The mere showing that a particular piece of evidence was irrelevant is not sufficient to merit reversal, however; Miller must also demonstrate that it was prejudiced by the admission of the evidence. *Patrons of Noble County School Corp. v. School City of Kendallville* (1963), 244 Ind. 675, 680–681, 194 N.E.2d 718, 721; *Anderson v. Pre–Fab Transit Co.* (1980), Ind.App., 409 N.E.2d 1157, 1168 n. 8. In *State v. Ingram* (1981), Ind., 427 N.E.2d 444, the supreme court considered whether the trial court erred in admitting into evidence at trial parts of a loan agreement between the plaintiff and dismissed defendants which contained prejudicial statements concerning the negligence of the state, the remaining defendant. In finding the admission of the evidence to have been, at most, harmless error, the court wrote:

> If we assume, for the sake of argument, that it was improper for the trial court to admit those parts of the agreement containing conclusory and prejudicial statements concerning the State's negligence and its liability for the accident, there was ample independent evidence presented concerning the State's negligence.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Erroneously admitted evidence that is merely cumulative in nature and thus contributed nothing to the jury's verdict is not reversible error.

*Ingram,* 427 N.E.2d at 446–447. As we noted in our discussion of Issue I, there was ample evidence—other than the Crowley letter—to support the verdict on the compensatory damage issue. The same may be said with respect to the impact of

the Crowley letter on the issue of punitive damages. As we determine under the discussion of the sixth issue, the evidence was sufficient to support an award of punitive damages. It remains sufficient if the Crowley letter is ignored. Thus the error, if any, in admission of the Crowley letter was harmless and presents no grounds for reversal.[7]

## V. Should Best Beers's Compensatory Damage Award Be Reversed For Failure To Mitigate Damages?

■ Miller next argues that the judgment for compensatory damages should be reversed because Best Beers failed to mitigate any damages which it may have incurred due to the termination. It notes that, in this state, a plaintiff must mitigate damages. *Parke County v. Ropak, Inc.* (1988), Ind.App., 526 N.E.2d 732, 740. Miller in essence concludes that, because it presented some evidence suggesting that Best Beers could have recouped some or all of its losses by selling additional quantities of the products of other brewers, the jury was constrained to find that Best Beers either succeeded in mitigating its damages, in which case it suffered no compensable damages, or that it failed to mitigate, in which case it was not entitled to damages.

■ Miller's argument is fatally flawed because it ignores the evidence favorable to the jury's verdict in favor of Best Beers. At trial, Miller bore the burden of proving either that Best Beers could have mitigated and did not or that Best Beers did mitigate and thus reduced the damage incurred due to Miller's actions. *Indiana Industries, Inc. v. Wedge Products, Inc.* (1982), Ind.App., 430 N.E.2d 419, 428; *Endsley v. Game–Show Placements, Ltd.* (1980), Ind.App., 401 N.E.2d 768, 773. In reviewing a jury verdict for a claimed failure to mitigate damages, we will neither reweigh the evidence nor judge the credibility of the witnesses. *Hirsch v. Merchants National Bank* (1975), 166 Ind.App. 497, 502, 336 N.E.2d 833, 836. Whenever we review a negative judgment, we will not

reverse unless the evidence is without conflict and necessarily leads to a conclusion contrary to that reached by the finder of fact at trial. *See, Ropak*, 526 N.E.2d at 740.

Here, the evidence conflicted on the issue of mitigation. Best Beers's expert, Professor Jaffee, testified that Best Beers reasonably could not be expected to replace its Miller sales with sales of competitors' products because Best Beers sold exclusively to retailers, who purchased in response to consumer demand for particular products. If it were to sell additional amounts of the competitors' product in a market which demanded Miller products, Best Beers would achieve nothing more than forcing retailers to take products which would not sell and which eventually would have to be destroyed at Best Beers's expense when they became overage. The jury was entitled to believe this testimony, and, because the evidence supports the verdict, we are not entitled to reverse the judgment based on that verdict.

## VI. Was The Punitive Damage Award Supported By Sufficient Evidence?

■ Miller contends that, for a number of reasons, the evidence on the record is insufficient to support the jury's determination that Miller's conduct merited the imposition of punitive damages. Miller first asserts that punitive damages are inappropriate in actions based on the mere breach of a contract, and it further asserts that punitive damages may only be awarded in contract actions where there is evidence that the breach was accompanied by some sort of oppressive conduct. Miller then reviews the evidence, which Miller contends demonstrates that the distributorship agreement was terminated for proper business purposes. In addition, Miller contends that the evidence establishes at most that Miller terminated the agreement due to a good faith dispute, and not due to any oppressive purpose. Finally, Miller makes the argument that an award of punitive

---

**7.** On retrial the issue of the admissibility of the Crowley letter may again arise. Unless Best

Beers can lay a different foundation for its admission, it would be inadmissible.

damages in this case would violate our constitutional guarantee of open courts.[8]

 In order to justify an award of punitive damages in a contract action, the plaintiff must show something more than the mere breach of a contract by the defendant; the plaintiff must produce clear and convincing evidence tending to establish that the breaching party acted with malice, fraud, gross negligence, or oppressiveness, but not a merely mistaken view of law or fact, honest error of judgment, over-zealousness, negligence, or other "non-iniquitous human failing." *Travelers Indemnity Co. v. Armstrong* (1982), Ind., 442 N.E.2d 349, 362; *Dahlin v. Amoco Oil Corp.* (1991), Ind.App., 567 N.E.2d 806, 810. On review of a punitive damage award, however, we do not employ some heightened standard of review or overreaching scrutiny. Rather, as Judge Miller recently wrote:

> The standard of appellate review for sufficiency on the issue of punitive damages should impose neither greater judicial scrutiny nor lesser deference to jury determinations than in review of other sufficiency questions. In addressing the issue of sufficiency of evidence, we will affirm a judgment of punitive damages if, considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find such

damages proven by clear and convincing evidence.

*Emerson v. Markle* (1989), Ind.App., 539 N.E.2d 35, 40–41 (emphasis added) (citing *Bud Wolf Chevrolet v. Robertson* (1988), Ind., 519 N.E.2d 135); *see also, Nehi Beverage Co. v. Sims* (1987), Ind.App., 509 N.E.2d 1125, 1129.[9]

 Thus, in determining whether the jury verdict finding Miller liable for punitive damages was supported by sufficient evidence, we may look only to the evidence supporting the verdict. In this case, there is a wealth of such evidence.

Best Beers sought to prove that Miller terminated the distributorship agreement in bad faith for an improper purpose. Proof of bad faith and improper purpose can support an award of punitive damages. *Central Beverage*, 172 Ind.App. at 103, 359 N.E.2d at 580. Best Beers produced evidence that Miller employees Catalane and Calvin O'Neal made false statements concerning Best Beers's sales efforts and the conduct of Best Beers's employees. Miller made accusations in its termination letter which were not even supported by Catalane's evaluation reports and memoranda. Best Beers demonstrated that Miller tolerated overage beer on the market after terminating the Best Beers distributorship ostensibly because Best Beers committed the cardinal sin of letting overage beer stay in the market. Best Beers produced evidence

**8.** This argument merits summary disposition. Miller asserts that large punitive damage awards will keep parties to a contract dispute from taking their case to court, which would violate Ind. Const. art. 1 § 12. It supports its argument by a single statement from the case of *State ex rel. Board of County Commissioners v. Laramore* (1911), 175 Ind. 478, 94 N.E. 761, a case which lends no support to an argument that large punitive damage awards are not available in contract actions. In *Laramore,* the supreme court considered whether certain fees charged by a county sheriff pursuant to a then existing statute violated the admonition that justice be "administered freely and without purchase." 175 Ind. at 480, 94 N.E. at 761. The court held that the fee statute did not violate the constitution, but conceded that in some circumstances overly high court fees might violate art. 1 § 12. *Laramore,* 175 Ind. at 485, 94 N.E. at 763. The court's opinion had nothing to do

with damages, and we hold that our constitution does not prohibit a punitive damage award in this case or in similar cases.

**9.** This approach is consistent with the standard by which we review sufficiency questions in criminal cases, which are the cases in which the party with the burden of proof must meet the most stringent burden—the burden of proving guilt beyond a reasonable doubt. Our supreme court has held that, because the trier of fact is the sole judge of the weight of the evidence in criminal cases, our appellate courts may not reweigh the evidence on appeal. *Smedley v. State* (1990), Ind., 561 N.E.2d 776, 782. If we may not employ a heightened standard of review in a criminal case, where the life or liberty of a person is put in jeopardy, we certainly may not employ a heightened standard of review in a punitive damages case, where money is involved.

that Catalane said that she would not rate Best Beers's performance as satisfactory no matter what favorable details appeared on its profile. Best Beers showed that Miller solicited unfavorable comments about Best Beers from retailers in the distributorship territory. Finally, Best Beers submitted evidence that Miller disliked competition among Miller distributors, that Miller preferred single distributor territories despite Indiana law disapproving such territories, that Monroe Beverage wrote Miller suggesting that Miller make it an all Miller distributor, and that Miller awarded Monroe Beverage the distributorship after terminating Best Beers. This evidence was not without dispute, but it was for the jury to decide where the weight of the evidence lay. We cannot say that no reasonable person could have found it to be clear and convincing, and, therefore we must defer to the jury's verdict.

VII. *Did The Trial Court Properly Instruct The Jury On The Burden Of Proof In A Punitive Damages Case?*

◼ Miller argues that the trial court erroneously instructed the jury on the burden of proof in a punitive damages action. The court's instruction read:

> In order to recover the award of punitive damages which it claims, the plaintiff must first prove that it is entitled to recover compensatory damages from the defendant; the plaintiff must then prove by clear and convincing evidence that the defendant in breaching the contract acted maliciously, fraudulently, willfully and wantonly with conscious disregard for probable injury to the plaintiff, or with gross negligence or oppressiveness that was not the result of mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing.

(Record, p. 6846). Miller asserts that this instruction was erroneous in that it did not require Best Beers to prove both the breach and the oppressive conduct necessary for punitive damages by clear and convincing evidence.

We have reviewed the decisions of the supreme court and court of appeals governing punitive damages, and we conclude that the trial court's instruction was not erroneous. Our supreme court first adopted the clear and convincing burden of proof for punitive damages in *Travelers Indemnity Co. v. Armstrong* (1982), Ind., 442 N.E.2d 349. In *Travelers,* the supreme court vacated an award of punitive damages because the "[p]laintiff's allegations of fraud, deceit and oppressive conduct simply have not been borne out by clear and convincing evidence." 442 N.E.2d at 363. This court has interpreted *Travelers* to require clear and convincing proof only of the elements of oppressiveness which are prerequisite to an award of punitive damages. Thus, in *Kopis v. Savage* (1986), Ind.App., 498 N.E.2d 1266, 1272, Judge Miller wrote, "In Indiana, exemplary [punitive] damages may be granted where there is clear and convincing evidence of malice, fraud, gross negligence, or oppressive conduct." In *Perry v. Leo P. Knoerzer Corp.* (1984), Ind.App., 472 N.E.2d 223, 225, Judge Conover wrote:

> An award for punitive damages must be supported by clear and convincing evidence indicating malice, fraud, gross negligence, or oppressive conduct. Further, the evidence must be inconsistent with a hypothesis of mere negligence, mistake of law or fact, overzealousness, or other noniniquitous human failing.

*See also, Peru Daily Tribune v. Shuler* (1989), Ind.App., 544 N.E.2d 560, 562; *Lazarus Department Store v. Sutherlin* (1989), Ind.App., 544 N.E.2d 513, 527.

These cases make it clear that the plaintiff need prove only those elements that justify punitive damages by clear and convincing evidence. The plaintiff need not prove the underlying breach of contract by clear and convincing evidence. To require such proof would be to invite confusion because the jury would be asked to judge the same facts—those concerning the breach—by two different burdens of proof: by a preponderance of the evidence with regard to the breach as a basis for compensatory damages and by clear and convincing evidence with regard to the breach as a basis for punitive damages. Such an approach would be confusing and unwork-

able, and is not required by our law. The trial court properly instructed the jury.

### VIII. Did The Trial Court Erroneously Pierce The Corporate Veil To Admit Evidence Of Philip Morris's Wealth And Instruct That The Jury Could Consider Philip Morris's Wealth In Awarding Punitive Damages?

■ Miller argues that the trial court erred in admitting into evidence the financial report of Miller's parent corporation, Philip Morris. We believe the admission of the Philip Morris annual report and the instruction to the jury that it could consider the assets of Philip Morris in assessing punitive damages against Miller were erroneous and were harmful.

At the outset, it should be noted that the Philip Morris report contained relevant financial information about its subsidiary Miller as well as financial information about other corporations owned by Philip Morris consolidated into a combined report. Best Beers had also obtained and later introduced the same relevant financial information about Miller in a separate format not containing information about other Philip Morris companies. At the time of offering the Philip Morris report, plaintiff argued its admissibility under *Archem, Inc. v. Simo* (1990), Ind.App., 549 N.E.2d 1054, *cert. dismissed,* —— U.S. ——, 111 S.Ct. 944, 112 L.Ed.2d 1032, and the trial court apparently overruled Miller's objection based on that case. To that point, all that had been given in evidence as to the relationship between Miller and Philip Morris was the testimony of Professor Jaffee that he believed Miller was a wholly owned subsidiary of Philip Morris.

■ One of the core purposes of the corporate form of business organization is to limit the capital at risk to that invested in the corporation and to protect the other assets of the owner or owners of the corporate stock from exposure to liability arising out of activities of the corporation. That purpose must give way at times to prevent injustice where the form belies the substance and

the fiction of corporate entity may be disregarded where one corporation is so organized and controlled and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of another corporation.

*Archem,* 549 N.E.2d at 1058 (quoting *Feucht v. Real Silk Hosiery Mills, Inc.* (in Banc 1938), 105 Ind.App. 405, 411, 12 N.E.2d 1019, 1021). We are not free to disregard the corporate form at will, and the mere fact that a corporation is the parent of another does not, in and of itself, render a parent corporation answerable for the faults of its subsidiaries. *Tolliver v. Mathas* (1989), Ind.App., 538 N.E.2d 971, 977–978. However, where the corporate form is a sham, and the subsidiary corporation is an alter ego or mere instrument of the parent, we may disregard the corporate form and allow an injured party to bring the parent to answer for the injury. *Stacey–Rand, Inc. v. J.J. Holman, Inc.* (1988), Ind.App., 527 N.E.2d 726, 728; *Extra Energy Coal Co. v. Diamond Energy Resources* (1984), Ind.App., 467 N.E.2d 439, 441; *Feucht,* 105 Ind.App. at 411, 12 N.E.2d at 1021–1022. Our courts have not found that any one factor will determine whether the subsidiary is merely the instrument of the parent; rather, we have looked to the totality of the circumstances in order to determine whether the parent controls the actions of the subsidiary. We have looked to indicia such as identity of boards of directors and officers, identity of business purpose, separation of corporate funds and financial records, and capitalization of the subsidiary in determining whether to pierce the veil. *See, e.g., Stacey–Rand,* 527 N.E.2d at 728–729; *Extra Energy,* 467 N.E.2d at 411; *Feucht,* 105 Ind.App. at 412–413, 12 N.E.2d at 1022.

■ Generally speaking, evidence of the wealth of a corporation is admissible on the question of punitive damages because such evidence helps the trier of fact to determine the level of monetary damages which will serve both to punish the wrongdoing corporation and to deter it and other potential wrongdoers from future wrongful conduct. *Riverside Insurance Co. v. Pedigo* (1982), Ind.App., 430 N.E.2d 796, 808–809; *see, F.D. Borkholder Co. v. Sandock*

(1980), 274 Ind. 612, 617, 413 N.E.2d 567, 571. Where a plaintiff seeks punitive damages against a subsidiary corporation, however, evidence of the wealth of the parent corporation is irrelevant and inadmissible unless the plaintiff can prove that the corporate veil should be pierced because the subsidiary was but the alter ego or mere instrument of the parent. *HCA Health Services, Inc. v. National Bank of Commerce* (1988), 294 Ark. 525, 531–532, 745 S.W.2d 120, 124; *Walker v. Dominick's Finer Foods, Inc.* (1981), 92 Ill.App.3d 645, 649–650, 415 N.E.2d 1213, 1217; *Liberty Financial Management Corp. v. Beneficial Data Processing Corp.* (1984), Mo. App., 670 S.W.2d 40, 51–52.

We find this case to be quite similar to *Liberty Financial.* There, the plaintiff filed an action in breach of contract and misrepresentation against the corporate defendant, Bencom, which was a wholly owned subsidiary of Beneficial Corp. The plaintiff, who was in the business of making consumer loans, decided to subscribe to an on-line data processing service offered by Bencom. When the system did not perform as the plaintiff expected, it filed suit and sought punitive damages from Bencom. At trial, the plaintiff offered the financial statement of Beneficial into evidence to prove Bencom's economic worth even though it had direct evidence of Bencom's worth available. The trial court admitted the statement into evidence over objection, and the plaintiff used the statement to argue to the jury that any punitive award should take into account *Beneficial's* worth. The jury awarded compensatory damages, but it did not award punitive damages.

Bencom appealed the compensatory award, alleging in part that the trial court committed prejudicial error in admitting into evidence the Beneficial statement. The court of appeals agreed, writing:

> That no punitive damages were awarded is of no particular consequence; the jury was clearly left with the notion that resources available to pay any verdict included the billion dollars of the parent, but non-party, corporation. On the record before us at this time, we conclude that the exhibit injected irrelevant matters into the case and should not have been admitted.

*Liberty Financial,* 670 S.W.2d at 52.

If the veil was not pierced, then the wealth of Philip Morris was not relevant and could not be considered for any purpose. The trial court, however, allowed Best Beers to put Philip Morris's financial statement into evidence and instructed the jury that it could consider Philip Morris's wealth in assessing punitive damages. The jury was urged by plaintiff's counsel, in his peroration, to punish Philip Morris. He told them that if they awarded the $23,767,-822 in punitive damages he was seeking, "you're punishing Philip Morris in doing so and you're deterring those companies who grew to gigantic size [so that they] cannot be allowed to wander like a bull through a china shop doing what they want to." (Record, pp. 7042–7043).

What was proved here that was most favorable to Best Beers on the issue of veil piercing was that Miller was owned by Philip Morris and that Miller had written a letter to Best Beers in which it stated its "continuing commitment, and that of Philip Morris Incorporated, to provide you with additional tools to achieve our mutually desired goals." That evidence falls far short of what need be proved to permit a piercing of the veil. It lacks enough substance to be weighed or reweighed on the issue.

■ We cannot find the error in admitting the Philip Morris financial statement to be harmless because the trial court specifically instructed the jury that it could consider "the amount of the assets and earnings of Philip Morris Companies, Inc....." in assessing punitive damages. (Record, p. 1532). This instruction invited the jury to assess damages against Miller based on Philip Morris's wealth, and the instruction is thus plainly erroneous. *See Ramada Hotel Operating Co. v. Shaffer* (1991), Ind.App., 576 N.E.2d 1264, 1271.

Best Beers also argues that any error in admitting the Philip Morris statement is harmless because the amount of punitive

damages is small compared to Philip Morris's wealth, but is supportable compared to Miller's wealth. It is true that the verdict of $1,989,000 in punitive damages might be supportable up against Miller's 1988 operating profit of $190,140,000 or assets of $1,622,886,000 as well as the 1988 consolidated net earnings for Philip Morris of $2,337,000,000 or assets of $36,960,000,000. (All sums involved are, in the words of the late senator from Illinois, "real money".) However, we cannot speculate what the jury might have done if it had been properly instructed. *Id.* A verdict for punitive damages against a defendant based on the wealth of someone else is plain error and the only cure is to retry the issue of what amount of punitive damages is appropriate.

## CONCLUSION

We have reviewed the record, and we find that the evidence supports the jury's verdict insofar as it found Miller liable for compensatory and punitive damages. We find the amount of compensatory damages to be supported by the evidence. We find, however, that the trial court erred when it admitted into evidence the financial report of Miller's parent corporation and instructed the jury that it could consider the wealth of Philip Morris in assessing punitive damages, and that the trial court's error could have lead the jury to assess an improper amount of punitive damages against Miller based on its parent's wealth. We therefore affirm the compensatory damage verdict in all respects and affirm the punitive damage verdict insofar as it finds Miller liable for punitive damages. However, we reverse the verdict insofar as it assessed punitive damages in the amount of $1,989,260, and we remand for a new trial limited to the issue of the proper amount of punitive damages.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

RATLIFF, C.J., concurs.

ROBERTSON, J., concurs in part and dissents in part with separate opinion.

ROBERTSON, Judge, concurring in part and dissenting in part.

I respectfully dissent to that portion of the majority opinion which remands for a new trial on the question of punitive damages.

Best Beers' argument that the amount of punitive damages which were awarded can be sustained solely upon the evidence of Miller Brewing Company's financial position is legally sound. Assuming there was error in admitting evidence on the financial worth of Philip Morris, it would be harmless at best in my opinion. The amount of punitive damages awarded fits comfortably within the scope of the evidence as it relates to Miller Brewing Company.

Among other things, our standard of review requires the appellant to demonstrate reversible error, which I feel has not been done, and that the court on review is to indulge in all reasonable presumptions which support the judgment of the trial court. *Raymundo v. Hammond Clinic Ass'n* (1983), Ind.App., 449 N.E.2d 276. Accordingly, I would affirm the judgment.

In all other respects I concur in the majority opinion.